# EXHIBIT C

United Nations

CCPR/C/GC/34

 **International Covenant on Civil and Political Rights**

Distr.: General
12 September 2011

Original: English

**Human Rights Committee**
**102nd session**
Geneva, 11-29 July 2011

# General comment No. 34

## Article 19: Freedoms of opinion and expression

### General remarks

1. This general comment replaces general comment No. 10 (nineteenth session).

2. Freedom of opinion and freedom of expression are indispensable conditions for the full development of the person. They are essential for any society.[1] They constitute the foundation stone for every free and democratic society. The two freedoms are closely related, with freedom of expression providing the vehicle for the exchange and development of opinions.

3. Freedom of expression is a necessary condition for the realization of the principles of transparency and accountability that are, in turn, essential for the promotion and protection of human rights.

4. Among the other articles that contain guarantees for freedom of opinion and/or expression, are articles 18, 17, 25 and 27. The freedoms of opinion and expression form a basis for the full enjoyment of a wide range of other human rights. For instance, freedom of expression is integral to the enjoyment of the rights to freedom of assembly and association, and the exercise of the right to vote.

5. Taking account of the specific terms of article 19, paragraph 1, as well as the relationship of opinion and thought (article 18), a reservation to paragraph 1 would be incompatible with the object and purpose of the Covenant.[2] Furthermore, although freedom of opinion is not listed among those rights that may not be derogated from pursuant to the provisions of article 4 of the Covenant, it is recalled that, "in those provisions of the Covenant that are not listed in article 4, paragraph 2, there are elements that in the

---

[1] See communication No. 1173/2003, *Benhadj v. Algeria*, Views adopted on 20 July 2007; No. 628/1995, *Park v. Republic of Korea*, Views adopted on 5 July 1996.

[2] See the Committee's general comment No. 24 (1994) on issues relating to reservations made upon ratification or accession to the Covenant or the Optional Protocols thereto, or in relation to the declarations under article 41 of the Covenant, *Official Records of the General Assembly, Fiftieth Session, Supplement No. 40*, vol. I (A/50/40 (Vol. I)), annex V.

GE.11-45331 

CCPR/C/GC/34

Committee's opinion cannot be made subject to lawful derogation under article 4".[3] Freedom of opinion is one such element, since it can never become necessary to derogate from it during a state of emergency.[4]

6. Taking account of the relationship of freedom of expression to the other rights in the Covenant, while reservations to particular elements of article 19, paragraph 2, may be acceptable, a general reservation to the rights set out in paragraph 2 would be incompatible with the object and purpose of the Covenant.[5]

7. The obligation to respect freedoms of opinion and expression is binding on every State party as a whole. All branches of the State (executive, legislative and judicial) and other public or governmental authorities, at whatever level – national, regional or local – are in a position to engage the responsibility of the State party.[6] Such responsibility may also be incurred by a State party under some circumstances in respect of acts of semi-State entities.[7] The obligation also requires States parties to ensure that persons are protected from any acts by private persons or entities that would impair the enjoyment of the freedoms of opinion and expression to the extent that these Covenant rights are amenable to application between private persons or entities.[8]

8. States parties are required to ensure that the rights contained in article 19 of the Covenant are given effect to in the domestic law of the State, in a manner consistent with the guidance provided by the Committee in its general comment No. 31 on the nature of the general legal obligation imposed on States parties to the Covenant. It is recalled that States parties should provide the Committee, in accordance with reports submitted pursuant to article 40, with the relevant domestic legal rules, administrative practices and judicial decisions, as well as relevant policy level and other sectorial practices relating to the rights protected by article 19, taking into account the issues discussed in the present general comment. They should also include information on remedies available if those rights are violated.

**Freedom of opinion**

9. Paragraph 1 of article 19 requires protection of the right to hold opinions without interference. This is a right to which the Covenant permits no exception or restriction. Freedom of opinion extends to the right to change an opinion whenever and for whatever reason a person so freely chooses. No person may be subject to the impairment of any rights under the Covenant on the basis of his or her actual, perceived or supposed opinions. All forms of opinion are protected, including opinions of a political, scientific, historic, moral or religious nature. It is incompatible with paragraph 1 to criminalize the holding of an opinion.[9] The harassment, intimidation or stigmatization of a person, including arrest,

---

[3] See the Committee's general comment No. 29 (2001) on derogation during a state of emergency, para. 13, *Official Records of the General Assembly, Fifty-sixth Session, Supplement No. 40*, vol. I (A/56/40 (Vol. I)), annex VI.
[4] General comment No. 29, para. 11.
[5] General comment No. 24.
[6] See the Committee's general comment No. 31 (2004) on the nature of the general legal obligation imposed on States parties to the Covenant, para. 4, *Official Records of the General Assembly, Fifty-ninth Session, Supplement No. 40*, vol. I (A/59/40 (Vol. I)), annex III
[7] See communication No. 61/1979, *Hertzberg et al. v. Finland*, Views adopted on 2 April 1982.
[8] General comment No. 31, para. 8; See communication No. 633/1995, *Gauthier v. Canada*, Views adopted on 7 April 1999.
[9] See communication No. 550/93, *Faurisson v. France*, Views adopted on 8 November 1996.

2

detention, trial or imprisonment for reasons of the opinions they may hold, constitutes a violation of article 19, paragraph 1.[10]

10. Any form of effort to coerce the holding or not holding of any opinion is prohibited.[11] Freedom to express one's opinion necessarily includes freedom not to express one's opinion.

## Freedom of expression

11. Paragraph 2 requires States parties to guarantee the right to freedom of expression, including the right to seek, receive and impart information and ideas of all kinds regardless of frontiers. This right includes the expression and receipt of communications of every form of idea and opinion capable of transmission to others, subject to the provisions in article 19, paragraph 3, and article 20.[12] It includes political discourse,[13] commentary on one's own[14] and on public affairs,[15] canvassing,[16] discussion of human rights,[17] journalism,[18] cultural and artistic expression,[19] teaching,[20] and religious discourse.[21] It may also include commercial advertising. The scope of paragraph 2 embraces even expression that may be regarded as deeply offensive,[22] although such expression may be restricted in accordance with the provisions of article 19, paragraph 3 and article 20.

12. Paragraph 2 protects all forms of expression and the means of their dissemination. Such forms include spoken, written and sign language and such non-verbal expression as images and objects of art.[23] Means of expression include books, newspapers,[24] pamphlets,[25] posters, banners,[26] dress and legal submissions.[27] They include all forms of audio-visual as well as electronic and internet-based modes of expression.

## Freedom of expression and the media

13. A free, uncensored and unhindered press or other media is essential in any society to ensure freedom of opinion and expression and the enjoyment of other Covenant rights. It constitutes one of the cornerstones of a democratic society.[28] The Covenant embraces a

---

[10] See communication No. 157/1983, *Mpaka-Nsusu v. Zaire*, Views adopted on 26 March 1986; No. 414/1990, *Mika Miha v. Equatorial Guinea*, Views adopted on 8 July 1994.
[11] See communication No. 878/1999, *Kang v. Republic of Korea*, Views adopted on 15 July 2003.
[12] See communications Nos. 359/1989 and 385/1989, *Ballantyne, Davidson and McIntyre v. Canada*, Views adopted on 18 October 1990.
[13] See communication No. 414/1990, *Mika Miha v. Equatorial Guinea*.
[14] See communication No. 1189/2003, *Fernando v. Sri Lanka*, Views adopted on 31 March 2005.
[15] See communication No. 1157/2003, *Coleman v. Australia*, Views adopted on 17 July 2006.
[16] Concluding observations on Japan (CCPR/C/JPN/CO/5).
[17] See communication No. 1022/2001, *Velichkin v. Belarus*, Views adopted on 20 October 2005.
[18] See communication No. 1334/2004, *Mavlonov and Sa'di v. Uzbekistan*, Views adopted on 19 March 2009.
[19] See communication No. 926/2000, *Shin v. Republic of Korea*, Views adopted on 16 March 2004.
[20] See communication No. 736/97, *Ross v. Canada*, Views adopted on 18 October 2000.
[21] Ibid.
[22] Ibid.
[23] See communication No. 926/2000, *Shin v. Republic of Korea*.
[24] See communication No. 1341/2005, *Zundel v. Canada*, Views adopted on 20 March 2007.
[25] See communication No. 1009/2001, *Shchetoko et al. v. Belarus*, Views adopted on 11 July 2006.
[26] See communication No. 412/1990, *Kivenmaa v. Finland*, Views adopted on 31 March 1994.
[27] See communication No. 1189/2003, *Fernando v. Sri Lanka*.
[28] See communication No. 1128/2002, *Marques v. Angola*, Views adopted on 29 March 2005.

right whereby the media may receive information on the basis of which it can carry out its function.[29] The free communication of information and ideas about public and political issues between citizens, candidates and elected representatives is essential. This implies a free press and other media able to comment on public issues without censorship or restraint and to inform public opinion.[30] The public also has a corresponding right to receive media output.[31]

14. As a means to protect the rights of media users, including members of ethnic and linguistic minorities, to receive a wide range of information and ideas, States parties should take particular care to encourage an independent and diverse media.

15. States parties should take account of the extent to which developments in information and communication technologies, such as internet and mobile based electronic information dissemination systems, have substantially changed communication practices around the world. There is now a global network for exchanging ideas and opinions that does not necessarily rely on the traditional mass media intermediaries. States parties should take all necessary steps to foster the independence of these new media and to ensure access of individuals thereto.

16. States parties should ensure that public broadcasting services operate in an independent manner.[32] In this regard, States parties should guarantee their independence and editorial freedom. They should provide funding in a manner that does not undermine their independence.

17. Issues concerning the media are discussed further in the section of this general comment that addresses restrictions on freedom of expression.

**Right of access to information**

18. Article 19, paragraph 2 embraces a right of access to information held by public bodies. Such information includes records held by a public body, regardless of the form in which the information is stored, its source and the date of production. Public bodies are as indicated in paragraph 7 of this general comment. The designation of such bodies may also include other entities when such entities are carrying out public functions. As has already been noted, taken together with article 25 of the Covenant, the right of access to information includes a right whereby the media has access to information on public affairs[33] and the right of the general public to receive media output.[34] Elements of the right of access to information are also addressed elsewhere in the Covenant. As the Committee observed in its general comment No. 16, regarding article 17 of the Covenant, every individual should have the right to ascertain in an intelligible form, whether, and if so, what personal data is stored in automatic data files, and for what purposes. Every individual should also be able to ascertain which public authorities or private individuals or bodies control or may control his or her files. If such files contain incorrect personal data or have been collected or processed contrary to the provisions of the law, every individual should have the right to have his or her records rectified. Pursuant to article 10 of the Covenant, a prisoner does not

---

[29] See communication No. 633/95, *Gauthier v. Canada*.
[30] See the Committee's general comment No. 25 (1996) on article 25 (Participation in public affairs and the right to vote), para. 25, *Official Records of the General Assembly, Fifty-first Session, Supplement No. 40*, vol. I (A/51/40 (Vol. I)), annex V.
[31] See communication No. 1334/2004, *Mavlonov and Sa'di v. Uzbekistan*.
[32] Concluding observations on Republic of Moldova (CCPR/CO/75/MDA).
[33] See communication No. 633/95, *Gauthier v. Canada*.
[34] See communication No. 1334/2004, *Mavlonov and Sa'di v. Uzbekistan*.

lose the entitlement to access to his medical records.[35] The Committee, in general comment No. 32 on article 14, set out the various entitlements to information that are held by those accused of a criminal offence.[36] Pursuant to the provisions of article 2, persons should be in receipt of information regarding their Covenant rights in general.[37] Under article 27, a State party's decision-making that may substantively compromise the way of life and culture of a minority group should be undertaken in a process of information-sharing and consultation with affected communities.[38]

19.     To give effect to the right of access to information, States parties should proactively put in the public domain Government information of public interest. States parties should make every effort to ensure easy, prompt, effective and practical access to such information. States parties should also enact the necessary procedures, whereby one may gain access to information, such as by means of freedom of information legislation.[39] The procedures should provide for the timely processing of requests for information according to clear rules that are compatible with the Covenant. Fees for requests for information should not be such as to constitute an unreasonable impediment to access to information. Authorities should provide reasons for any refusal to provide access to information. Arrangements should be put in place for appeals from refusals to provide access to information as well as in cases of failure to respond to requests.

### Freedom of expression and political rights

20.     The Committee, in general comment No. 25 on participation in public affairs and the right to vote, elaborated on the importance of freedom of expression for the conduct of public affairs and the effective exercise of the right to vote. The free communication of information and ideas about public and political issues between citizens, candidates and elected representatives is essential. This implies a free press and other media able to comment on public issues and to inform public opinion without censorship or restraint.[40] The attention of States parties is drawn to the guidance that general comment No. 25 provides with regard to the promotion and the protection of freedom of expression in that context.

### The application of article 19 (3)

21.     Paragraph 3 expressly states that the exercise of the right to freedom of expression carries with it special duties and responsibilities. For this reason two limitative areas of restrictions on the right are permitted, which may relate either to respect of the rights or reputations of others or to the protection of national security or of public order (*ordre public*) or of public health or morals. However, when a State party imposes restrictions on the exercise of freedom of expression, these may not put in jeopardy the right itself. The Committee recalls that the relation between right and restriction and between norm and exception must not be reversed.[41] The Committee also recalls the provisions of article 5,

---

[35] See communication No. 726/1996, *Zheludkov v. Ukraine*, Views adopted on 29 October 2002.
[36] See the Committee's general comment No. 32 (2007) on the right to equality before courts and tribunals and to a fair trial, para. 33, *Official Records of the General Assembly, Sixty-second Session, Supplement No. 40, vol. I (A/62/40 (Vol. I)), annex VI*
[37] General comment No. 31.
[38] See communication No. 1457/2006, *Poma v. Peru*, Views adopted on 27 March 2009.
[39] Concluding observations on Azerbaijan (CCPR/C/79/Add.38 (1994)).
[40] See General comment No. 25 on article 25 of the Covenant, para. 25.
[41] See the Committee's general comment No. 27 on article 12, *Official Records of the General Assembly, Fifty-fifth Session, Supplement No. 40*, vol. I (A/55/40 (Vol. I)), annex VI, sect. A

paragraph 1, of the Covenant according to which "nothing in the present Covenant may be interpreted as implying for any State, group or person any right to engage in any activity or perform any act aimed at the destruction of any of the rights and freedoms recognized herein or at their limitation to a greater extent than is provided for in the present Covenant".

22. Paragraph 3 lays down specific conditions and it is only subject to these conditions that restrictions may be imposed: the restrictions must be "provided by law"; they may only be imposed for one of the grounds set out in subparagraphs (a) and (b) of paragraph 3; and they must conform to the strict tests of necessity and proportionality.[42] Restrictions are not allowed on grounds not specified in paragraph 3, even if such grounds would justify restrictions to other rights protected in the Covenant. Restrictions must be applied only for those purposes for which they were prescribed and must be directly related to the specific need on which they are predicated.[43]

23. States parties should put in place effective measures to protect against attacks aimed at silencing those exercising their right to freedom of expression. Paragraph 3 may never be invoked as a justification for the muzzling of any advocacy of multi-party democracy, democratic tenets and human rights.[44] Nor, under any circumstance, can an attack on a person, because of the exercise of his or her freedom of opinion or expression, including such forms of attack as arbitrary arrest, torture, threats to life and killing, be compatible with article 19.[45] Journalists are frequently subjected to such threats, intimidation and attacks because of their activities.[46] So too are persons who engage in the gathering and analysis of information on the human rights situation and who publish human rights-related reports, including judges and lawyers.[47] All such attacks should be vigorously investigated in a timely fashion, and the perpetrators prosecuted,[48] and the victims, or, in the case of killings, their representatives, be in receipt of appropriate forms of redress.[49]

24. Restrictions must be provided by law. Law may include laws of parliamentary privilege[50] and laws of contempt of court.[51] Since any restriction on freedom of expression constitutes a serious curtailment of human rights, it is not compatible with the Covenant for a restriction to be enshrined in traditional, religious or other such customary law.[52]

25. For the purposes of paragraph 3, a norm, to be characterized as a "law", must be formulated with sufficient precision to enable an individual to regulate his or her conduct accordingly[53] and it must be made accessible to the public. A law may not confer unfettered discretion for the restriction of freedom of expression on those charged with its execution.[54]

---

[42] See communication No. 1022/2001, *Velichkin v. Belarus*, Views adopted on 20 October 2005.
[43] See the Committee's general comment No. 22, *Official Records of the General Assembly, Forty-eighth Session, Supplement No. 40* (A/48/40), annex VI
[44] See communication No. 458/91, *Mukong v. Cameroon*, Views adopted on 21 July 1994.
[45] See communication No. 1353/2005, *Njaru v. Cameroon*, Views adopted on 19 March 2007.
[46] See, for instance, concluding observations on Algeria (CCPR/C/DZA/CO/3); concluding observations on Costa Rica (CCPR/C/CRI/CO/5); concluding observations on Sudan (CCPR/C/SDN/CO/3).
[47] See communication No. 1353/2005, *Njaru v. Cameroon* ; concluding observations on Nicaragua (CCPR/C/NIC/CO/3); concluding observations on Tunisia (CCPR/C/TUN/CO/5); concluding observations on the Syrian Arab Republic (CCPR/CO/84/SYR); concluding observations on Colombia (CCPR/CO/80/COL).
[48] Ibid. and concluding observations on Georgia (CCPR/C/GEO/CO/3).
[49] Concluding observations on Guyana (CCPR/C/79/Add.121).
[50] See communication No. 633/95, *Gauthier v. Canada*.
[51] See communication No. 1373/2005, *Dissanayake v. Sri Lanka*, Views adopted on 22 July 2008.
[52] See general comment No. 32.
[53] See communication No. 578/1994, *de Groot v. The Netherlands*, Views adopted on 14 July 1995.
[54] See general comment No. 27.

Laws must provide sufficient guidance to those charged with their execution to enable them to ascertain what sorts of expression are properly restricted and what sorts are not.

26. Laws restricting the rights enumerated in article 19, paragraph 2, including the laws referred to in paragraph 24, must not only comply with the strict requirements of article 19, paragraph 3 of the Covenant but must also themselves be compatible with the provisions, aims and objectives of the Covenant.[55] Laws must not violate the non-discrimination provisions of the Covenant. Laws must not provide for penalties that are incompatible with the Covenant, such as corporal punishment.[56]

27. It is for the State party to demonstrate the legal basis for any restrictions imposed on freedom of expression.[57] If, with regard to a particular State party, the Committee has to consider whether a particular restriction is imposed by law, the State party should provide details of the law and of actions that fall within the scope of the law.[58]

28. The first of the legitimate grounds for restriction listed in paragraph 3 is that of respect for the rights or reputations of others. The term "rights" includes human rights as recognized in the Covenant and more generally in international human rights law. For example, it may be legitimate to restrict freedom of expression in order to protect the right to vote under article 25, as well as rights article under 17 (see para. 37).[59] Such restrictions must be constructed with care: while it may be permissible to protect voters from forms of expression that constitute intimidation or coercion, such restrictions must not impede political debate, including, for example, calls for the boycotting of a non-compulsory vote.[60] The term "others" relates to other persons individually or as members of a community.[61] Thus, it may, for instance, refer to individual members of a community defined by its religious faith[62] or ethnicity.[63]

29. The second legitimate ground is that of protection of national security or of public order (*ordre public*), or of public health or morals.

30. Extreme care must be taken by States parties to ensure that treason laws[64] and similar provisions relating to national security, whether described as official secrets or sedition laws or otherwise, are crafted and applied in a manner that conforms to the strict requirements of paragraph 3. It is not compatible with paragraph 3, for instance, to invoke such laws to suppress or withhold from the public information of legitimate public interest that does not harm national security or to prosecute journalists, researchers, environmental activists, human rights defenders, or others, for having disseminated such information.[65] Nor is it generally appropriate to include in the remit of such laws such categories of information as those relating to the commercial sector, banking and scientific progress.[66] The Committee has found in one case that a restriction on the issuing of a statement in

---

[55] See communication No. 488/1992, *Toonen v. Australia*, Views adopted on 30 March 1994.
[56] General comment No. 20, *Official Records of the General Assembly, Forty-seventh Session, Supplement No. 40 (A/47/40), annex VI, sect. A.*
[57] See communication No. 1553/2007, *Korneenko et al. v. Belarus*, Views adopted on 31 October 2006.
[58] See communication No. 132/1982, *Jaona v. Madagascar*, Views adopted on 1 April 1985.
[59] See communication No. 927/2000, *Svetik v. Belarus*, Views adopted on 8 July 2004.
[60] Ibid.
[61] See communication No. 736/97, *Ross v. Canada*, Views adopted on 18 October 2000.
[62] See communication No. 550/93, *Faurisson v. France*; concluding observations on Austria (CCPR/C/AUT/CO/4).
[63] Concluding observations on Slovakia (CCPR/CO/78/SVK); concluding observations on Israel (CCPR/CO/78/ISR).
[64] Concluding observations on Hong Kong (CCPR/C/HKG/CO/2).
[65] Concluding observations on the Russian Federation (CCPR/CO/79/RUS).
[66] Concluding observations on Uzbekistan (CCPR/CO/71/UZB).

support of a labour dispute, including for the convening of a national strike, was not permissible on the grounds of national security.[67]

31.     On the basis of maintenance of public order (*ordre public*) it may, for instance, be permissible in certain circumstances to regulate speech-making in a particular public place.[68] Contempt of court proceedings relating to forms of expression may be tested against the public order (*ordre public*) ground. In order to comply with paragraph 3, such proceedings and the penalty imposed must be shown to be warranted in the exercise of a court's power to maintain orderly proceedings.[69] Such proceedings should not in any way be used to restrict the legitimate exercise of defence rights.

32.     The Committee observed in general comment No. 22, that "the concept of morals derives from many social, philosophical and religious traditions; consequently, limitations... for the purpose of protecting morals must be based on principles not deriving exclusively from a single tradition". Any such limitations must be understood in the light of universality of human rights and the principle of non-discrimination

33.     Restrictions must be "necessary" for a legitimate purpose. Thus, for instance, a prohibition on commercial advertising in one language, with a view to protecting the language of a particular community, violates the test of necessity if the protection could be achieved in other ways that do not restrict freedom of expression.[70] On the other hand, the Committee has considered that a State party complied with the test of necessity when it transferred a teacher who had published materials that expressed hostility toward a religious community to a non-teaching position in order to protect the right and freedom of children of that faith in a school district.[71]

34.     Restrictions must not be overbroad. The Committee observed in general comment No. 27 that "restrictive measures must conform to the principle of proportionality; they must be appropriate to achieve their protective function; they must be the least intrusive instrument amongst those which might achieve their protective function; they must be proportionate to the interest to be protected…The principle of proportionality has to be respected not only in the law that frames the restrictions but also by the administrative and judicial authorities in applying the law".[72] The principle of proportionality must also take account of the form of expression at issue as well as the means of its dissemination. For instance, the value placed by the Covenant upon uninhibited expression is particularly high in the circumstances of public debate in a democratic society concerning figures in the public and political domain.[73]

35.     When a State party invokes a legitimate ground for restriction of freedom of expression, it must demonstrate in specific and individualized fashion the precise nature of the threat, and the necessity and proportionality of the specific action taken, in particular by establishing a direct and immediate connection between the expression and the threat.[74]

36.     The Committee reserves to itself an assessment of whether, in a given situation, there may have been circumstances which made a restriction of freedom of expression

---

[67] See communication No. 518/1992, *Sohn v. Republic of Korea*, Views adopted on 18 March 1994.
[68] See communication No. 1157/2003, *Coleman v. Australia*.
[69] See communication No. 1373/2005, *Dissanayake v. Sri Lanka*.
[70] See communication No. 359, 385/89, *Ballantyne , Davidson and McIntyre v. Canada*.
[71] See communication No. 736/97, *Ross v. Canada*, Views adopted on 17 July 2006.
[72] General comment No. 27, para. 14. See also Communications No. 1128/2002, *Marques v. Angola*; No. 1157/2003, *Coleman v. Australia*.
[73] See communication No. 1180/2003, *Bodrozic v. Serbia and Montenegro*, Views adopted on 31 October 2005.
[74] See communication No. 926/2000, *Shin v. Republic of Korea* .

necessary.[75] In this regard, the Committee recalls that the scope of this freedom is not to be assessed by reference to a "margin of appreciation"[76] and in order for the Committee to carry out this function, a State party, in any given case, must demonstrate in specific fashion the precise nature of the threat to any of the enumerated grounds listed in paragraph 3 that has caused it to restrict freedom of expression.[77]

### Limitative scope of restrictions on freedom of expression in certain specific areas

37. Among restrictions on political discourse that have given the Committee cause for concern are the prohibition of door-to-door canvassing,[78] restrictions on the number and type of written materials that may be distributed during election campaigns,[79] blocking access during election periods to sources, including local and international media, of political commentary,[80] and limiting access of opposition parties and politicians to media outlets.[81] Every restriction should be compatible with paragraph 3. However, it may be legitimate for a State party to restrict political polling imminently preceding an election in order to maintain the integrity of the electoral process.[82]

38. As noted earlier in paragraphs 13 and 20, concerning the content of political discourse, the Committee has observed that in circumstances of public debate concerning public figures in the political domain and public institutions, the value placed by the Covenant upon uninhibited expression is particularly high.[83] Thus, the mere fact that forms of expression are considered to be insulting to a public figure is not sufficient to justify the imposition of penalties, albeit public figures may also benefit from the provisions of the Covenant.[84] Moreover, all public figures, including those exercising the highest political authority such as heads of state and government, are legitimately subject to criticism and political opposition.[85] Accordingly, the Committee expresses concern regarding laws on such matters as, lese majesty,[86] *desacato*,[87] disrespect for authority,[88] disrespect for flags and symbols, defamation of the head of state[89] and the protection of the honour of public officials,[90] and laws should not provide for more severe penalties solely on the basis of the

---

[75] See communication No. 518/1992, *Sohn v. Republic of Korea* .
[76] See communication No. 511/1992, *Ilmari Länsman, et al. v. Finland*, Views adopted on 14 October 1993.
[77] See communications Nos. 518/92, *Sohn v. Republic of Korea*; No. 926/2000, *Shin v. Republic of Korea*,.
[78] Concluding observations on Japan (CCPR/C/JPN/CO/5).
[79] Ibid.
[80] Concluding observations on Tunisia (CCPR/C/TUN/CO/5).
[81] Concluding observations on Togo (CCPR/CO/76/TGO); concluding observations on Moldova (CCPR/CO/75/MDA).
[82] See communication No. 968/2001, *Kim v. Republic of Korea*, Views adopted on 14 March 1996.
[83] See communication No. 1180/2003, *Bodrozic v. Serbia and Montenegro*, Views adopted on 31 October 2005.
[84] Ibid.
[85] See communication No. 1128/2002, *Marques v. Angola*.
[86] See communications Nos. 422-424/1990, *Aduayom et al. v. Togo*, Views adopted on 30 June 1994.
[87] Concluding observations on the Dominican Republic (CCPR/CO/71/DOM).
[88] Concluding observations on Honduras (CCPR/C/HND/CO/1).
[89] See concluding observations on Zambia (CCPR/ZMB/CO/3), para.25.
[90] See concluding observations on Costa Rica (CCPR/C/CRI/CO/5), para. 11.

CCPR/C/GC/34

identity of the person that may have been impugned. States parties should not prohibit criticism of institutions, such as the army or the administration.[91]

39. States parties should ensure that legislative and administrative frameworks for the regulation of the mass media are consistent with the provisions of paragraph 3.[92] Regulatory systems should take into account the differences between the print and broadcast sectors and the internet, while also noting the manner in which various media converge. It is incompatible with article 19 to refuse to permit the publication of newspapers and other print media other than in the specific circumstances of the application of paragraph 3. Such circumstances may never include a ban on a particular publication unless specific content, that is not severable, can be legitimately prohibited under paragraph 3. States parties must avoid imposing onerous licensing conditions and fees on the broadcast media, including on community and commercial stations.[93] The criteria for the application of such conditions and licence fees should be reasonable and objective,[94] clear,[95] transparent,[96] non-discriminatory and otherwise in compliance with the Covenant.[97] Licensing regimes for broadcasting via media with limited capacity, such as audiovisual terrestrial and satellite services should provide for an equitable allocation of access and frequencies between public, commercial and community broadcasters. It is recommended that States parties that have not already done so should establish an independent and public broadcasting licensing authority, with the power to examine broadcasting applications and to grant licenses.[98]

40. The Committee reiterates its observation in general comment No. 10 that "because of the development of modern mass media, effective measures are necessary to prevent such control of the media as would interfere with the right of everyone to freedom of expression". The State should not have monopoly control over the media and should promote plurality of the media.[99] Consequently, States parties should take appropriate action, consistent with the Covenant, to prevent undue media dominance or concentration by privately controlled media groups in monopolistic situations that may be harmful to a diversity of sources and views.

41. Care must be taken to ensure that systems of government subsidy to media outlets and the placing of government advertisements[100] are not employed to the effect of impeding freedom of expression.[101] Furthermore, private media must not be put at a disadvantage compared to public media in such matters as access to means of dissemination/distribution and access to news.[102]

---

[91] Ibid., and see concluding observations on Tunisia (CCPR/C/TUN/CO/5), para. 91..
[92] See concluding observations on Viet Nam (CCPR/CO/75/VNM), para. 18, and concluding observations on Lesotho (CCPR/CO/79/Add.106), para. 23.
[93] Concluding observations on Gambia (CCPR/CO/75/GMB).
[94] See concluding observations on Lebanon (CCPR/CO/79/Add.78), para. 25.
[95] Concluding observations on Kuwait (CCPR/CO/69/KWT); concluding observations on Ukraine (CCPR/CO/73/UKR).
[96] Concluding observations on Kyrgyzstan (CCPR/CO/69/KGZ).
[97] Concluding observations on Ukraine (CCPR/CO/73/UKR).
[98] Concluding observations on Lebanon (CCPR/CO/79/Add.78).
[99] See concluding observations on Guyana (CCPR/CO/79/Add.121), para. 19; concluding observations on the Russian Federation (CCPR/CO/79/RUS); concluding observations on Viet Nam (CCPR/CO/75/VNM); concluding observations on Italy (CCPR/C/79/Add. 37).
[100] See concluding observations on Lesotho (CCPR/CO/79/Add.106), para. 22.
[101] Concluding observations on Ukraine (CCPR/CO/73/UKR).
[102] Concluding observations on Sri Lanka (CCPR/CO/79/LKA); and see concluding observations on Togo (CCPR/CO/76/TGO), para. 17.

42.   The penalization of a media outlet, publishers or journalist solely for being critical of the government or the political social system espoused by the government[103] can never be considered to be a necessary restriction of freedom of expression.

43.   Any restrictions on the operation of websites, blogs or any other internet-based, electronic or other such information dissemination system, including systems to support such communication, such as internet service providers or search engines, are only permissible to the extent that they are compatible with paragraph 3. Permissible restrictions generally should be content-specific; generic bans on the operation of certain sites and systems are not compatible with paragraph 3. It is also inconsistent with paragraph 3 to prohibit a site or an information dissemination system from publishing material solely on the basis that it may be critical of the government or the political social system espoused by the government.[104]

44.   Journalism is a function shared by a wide range of actors, including professional full-time reporters and analysts, as well as bloggers and others who engage in forms of self-publication in print, on the internet or elsewhere, and general State systems of registration or licensing of journalists are incompatible with paragraph 3. Limited accreditation schemes are permissible only where necessary to provide journalists with privileged access to certain places and/or events. Such schemes should be applied in a manner that is non-discriminatory and compatible with article 19 and other provisions of the Covenant, based on objective criteria and taking into account that journalism is a function shared by a wide range of actors.

45.   It is normally incompatible with paragraph 3 to restrict the freedom of journalists and others who seek to exercise their freedom of expression (such as persons who wish to travel to human rights-related meetings)[105] to travel outside the State party, to restrict the entry into the State party of foreign journalists to those from specified countries[106] or to restrict freedom of movement of journalists and human rights investigators within the State party (including to conflict-affected locations, the sites of natural disasters and locations where there are allegations of human rights abuses). States parties should recognize and respect that element of the right of freedom of expression that embraces the limited journalistic privilege not to disclose information sources.[107]

46.   States parties should ensure that counter-terrorism measures are compatible with paragraph 3. Such offences as "encouragement of terrorism"[108] and "extremist activity"[109] as well as offences of "praising", "glorifying", or "justifying" terrorism, should be clearly defined to ensure that they do not lead to unnecessary or disproportionate interference with freedom of expression. Excessive restrictions on access to information must also be avoided. The media plays a crucial role in informing the public about acts of terrorism and its capacity to operate should not be unduly restricted. In this regard, journalists should not be penalized for carrying out their legitimate activities.

---

[103] Concluding observations on Peru (CCPR/CO/70/PER).
[104] Concluding observations on the Syrian Arab Republic (CCPR/CO/84/SYR).
[105] Concluding observations on Uzbekistan (CCPR/CO/83/UZB); concluding observations on Morocco (CCPR/CO/82/MAR).
[106] Concluding observations on Democratic People's Republic of Korea (CCPR/CO/72/PRK).
[107] Concluding observations on Kuwait (CCPR/CO/69/KWT).
[108] Concluding observations on the United Kingdom of Great Britain and Northern Ireland (CCPR/C/GBR/CO/6).
[109] Concluding observations on the Russian Federation (CCPR/CO/79/RUS).

47.     Defamation laws must be crafted with care to ensure that they comply with paragraph 3, and that they do not serve, in practice, to stifle freedom of expression.[110] All such laws, in particular penal defamation laws, should include such defences as the defence of truth and they should not be applied with regard to those forms of expression that are not, of their nature, subject to verification. At least with regard to comments about public figures, consideration should be given to avoiding penalizing or otherwise rendering unlawful untrue statements that have been published in error but without malice.[111] In any event, a public interest in the subject matter of the criticism should be recognized as a defence. Care should be taken by States parties to avoid excessively punitive measures and penalties. Where relevant, States parties should place reasonable limits on the requirement for a defendant to reimburse the expenses of the successful party.[112] States parties should consider the decriminalization of defamation[113] and, in any case, the application of the criminal law should only be countenanced in the most serious of cases and imprisonment is never an appropriate penalty. It is impermissible for a State party to indict a person for criminal defamation but then not to proceed to trial expeditiously – such a practice has a chilling effect that may unduly restrict the exercise of freedom of expression of the person concerned and others.[114]

48.     Prohibitions of displays of lack of respect for a religion or other belief system, including blasphemy laws, are incompatible with the Covenant, except in the specific circumstances envisaged in article 20, paragraph 2, of the Covenant. Such prohibitions must also comply with the strict requirements of article 19, paragraph 3, as well as such articles as 2, 5, 17, 18 and 26. Thus, for instance, it would be impermissible for any such laws to discriminate in favour of or against one or certain religions or belief systems, or their adherents over another, or religious believers over non-believers. Nor would it be permissible for such prohibitions to be used to prevent or punish criticism of religious leaders or commentary on religious doctrine and tenets of faith.[115]

49.     Laws that penalize the expression of opinions about historical facts are incompatible with the obligations that the Covenant imposes on States parties in relation to the respect for freedom of opinion and expression.[116] The Covenant does not permit general prohibition of expressions of an erroneous opinion or an incorrect interpretation of past events. Restrictions on the right of freedom of opinion should never be imposed and, with regard to freedom of expression, they should not go beyond what is permitted in paragraph 3 or required under article 20.

### The relationship between articles 19 and 20

50.     Articles 19 and 20 are compatible with and complement each other. The acts that are addressed in article 20 are all subject to restriction pursuant to article 19, paragraph 3. As

---

[110] Concluding observations on the United Kingdom of Great Britain and Northern Ireland (CCPR/C/GBR/CO/6).
[111] Ibid.
[112] Ibid.
[113] Concluding observations on Italy (CCPR/C/ITA/CO/5); concluding observations on the Former Yugoslav Republic of Macedonia (CCPR/C/MKD/CO/2).
[114] See communication No. 909/2000, *Kankanamge v. Sri Lanka*, Views adopted on 27 July 2004.
[115] Concluding observations on the United Kingdom of Great Britain and Northern Ireland-the Crown Dependencies of Jersey, Guernsey and the Isle of Man (CCPR/C/79/Add.119). See also concluding observations on Kuwait (CCPR/CO/69/KWT).
[116] So called "memory-laws", see communication No. , No. 550/93, *Faurisson v. France*. See also concluding observations on Hungary (CCPR/C/HUN/CO/5) paragraph 19.

such, a limitation that is justified on the basis of article 20 must also comply with article 19, paragraph 3.[117]

51.   What distinguishes the acts addressed in article 20 from other acts that may be subject to restriction under article 19, paragraph 3, is that for the acts addressed in article 20, the Covenant indicates the specific response required from the State: their prohibition by law. It is only to this extent that article 20 may be considered as *lex specialis* with regard to article 19.

52.   It is only with regard to the specific forms of expression indicated in article 20 that States parties are obliged to have legal prohibitions. In every case in which the State restricts freedom of expression it is necessary to justify the prohibitions and their provisions in strict conformity with article 19.

---

[117] See communication No. 736/1997, *Ross v. Canada*, Views adopted on 18 October 2000.