# BRAUNHAGEY & BORDEN LLP

San Francisco & New York

**Eva Schueller, Esq.**
Partner
schueller@braunhagey.com

June 29, 2017

**VIA ECF AND CHAMBERS COPY**

Honorable Donna M. Ryu
U.S. District Court for the Northern District of California
Oakland Courthouse, Courtroom 4
1301 Clay Street
Oakland, CA 94612, USA

> **Re:** **Supplemental Information re. ICC Victims' Request for Information,** *In re: Sam Rainsy*, **Case No. 4:16-mc-80258-DMR (N.D. Cal.)**

Dear Judge Ryu:

On behalf of the Cambodian citizens who are accusing the Cambodian government of crimes against humanity before the International Criminal Court in the above matter, we write to request leave to file the appended short supplemental information addressing an open issue raised by the Court at the June 8, 2017 hearing concerning Your Honor's jurisdiction in light of the Foreign Nationals Exception, Section 7433, and Presidential waiver provision, Section 7422, of the American Servicemembers' Protection Act (the "Act").  22 U.S.C. §§ 7421, *et seq.*

During the hearing, the Court inquired whether the Foreign Nationals Exception should be read together, or separate from, the Act's more detailed provisions governing the President's authority to seek limited waiver from Congress to assist the ICC.  (Tr. at 9–12.)

We respectfully seek leave to briefly address this issue here — the clear answer being that United States agencies and Congress have consistently and expressly relied upon the Foreign Nationals Exception to authorize support to the ICC *without any presidential waiver* (necessarily, as such waiver authority is non-delegable).  Several examples of such support are described in the Applicants' proposed submission attached.  The submission also explains that adopting a contrary, novel interpretation barring judicial assistance here would call into question a decade's worth of U.S.–ICC policy.

\* \* \*

Applicants have met and conferred with Chevron about this request, and Chevron has stated that it reserves the right to object or respond upon reviewing the proposed supplemental information. Applicants have no objection to Chevron submitting a response.

**San Francisco**
220 Sansome Street, 2nd Floor
San Francisco, CA 94104
Tel. & Fax:  (415) 599-0210

**New York**
80 Broad Street, Suite 1302
New York, NY 10004
Tel. & Fax:  (646) 829-9403

June 29, 2017
Page 2

Respectfully submitted,

Eva Schueller

Cc:     Counsel of Record (via ECF)

1 | J. Noah Hagey, Esq. (SBN: 262331)
  |   hagey@braunhagey.com
2 | Eva Schueller, Esq. (SBN: 237886)
  |   schueller@braunhagey.com
3 | BRAUNHAGEY & BORDEN LLP
  | 220 Sansome Street, Second Floor
4 | San Francisco, CA 94104
  | Telephone: (415) 599-0210
5 | Facsimile: (415) 276-1808

6 | COUNSEL FOR APPLICANTS SAM RAINSY
  | and ICC FILING VICTIMS
7 |

8 | **UNITED STATES DISTRICT COURT**

9 | **NORTHERN DISTRICT OF CALIFORNIA**

10 |

---

*In re* Ex Parte Application of

SAM RAINSY and FILING VICTIMS before
the International Criminal Court,

     Applicants,

For an Order Pursuant to 28 U.S.C. § 1782
Granting Leave to Obtain Discovery from

CHEVRON CORPORATION,

For use in Foreign Proceedings.

Case No. 4:16-mc-80258-DMR

**FILING VICTIMS' SUPPLEMENTAL
BRIEF IN SUPPORT OF APPLICANTS'
OPPOSITION TO CHEVRON
CORPORATION'S MOTION TO QUASH
AND MOTION TO VACATE ORDER
GRANTING THE INTERNATIONAL
CRIMINAL COURT FILING VICTIMS'
AND SAM RAINSY'S APPLICATION
FOR DISCOVERY UNDER 28 U.S.C. §
1782**

[Submitted concurrently with Filing Victims'
Request for Judicial Notice]

---

Cambodian citizens who are accusing the Cambodian government of crimes against humanity before the International Criminal Court ("Cambodian Victims"), respectfully submit this Supplemental Brief to address an open issue raised by the Court at the June 8, 2017 hearing concerning certain sections of the American Servicemembers' Protection Act (the "Act" or "ASPA"). 22 U.S.C. § 7421, *et seq*. The practical application of the Act was not previously raised or briefed by the parties.

## **INTRODUCTION**

Over the past decade, U.S. agencies and Congress have repeatedly relied on 22 U.S.C. § 7433 (the "Foreign Nationals Exception") as providing the authority that allows them to render assistance to ICC prosecutions and to enact additional legislation supporting those efforts, despite ASPA's bar on providing assistance to the ICC. They have done so without use of the President's waiver authority, which may only be delegated to the Secretary of Defense and may not be subdelegated. *See* 22 U.S.C. § 7431. United States Ambassadors have expressly cited the Foreign Nationals Exception as authorizing, for example, United States support to the trial of former Liberian President Charles Taylor at the ICC and for abstaining, rather than vetoing, the UN Security Council's resolution referring the situation in Darfur to the prosecutor of the ICC.

The State Department's Rewards for Justice Program has also been referred to as authorized under the Foreign Nationals Exception. The Program provides for the payment of rewards to assist in the prevention of acts of crimes against humanity, among other criminal acts under international law. At least two pending ICC prosecutions, those of Dominic Ongwen from Uganda and Jean Bosco Ntaganda from the Congo, have been assisted through the Program. Indeed, when the ICC took custody of Ntaganda, it issued a press release expressly thanking "American authorities" for their "support and cooperation … in Kigali (Rwanda) and in the Netherlands." There was no Presidential waiver for that assistance.

As explained further below, these and other examples of U.S. assistance to the ICC as it pursues foreign nationals accused of the gravest of crimes, would be rendered unlawful under Chevron's interpretation of the Act.

SUPP. BRIEF ISO APPLICANTS' OPP. TO CHEVRON'S MOTION TO QUASH

# ARGUMENT

This Court has jurisdiction to render discovery assistance to the Applicants under the Foreign Nationals Exception, which states: "Nothing in this title shall prohibit the United States from rendering assistance to international efforts to bring to justice . . . foreign nationals accused of genocide, war crimes or crimes against humanity." 22 U.S.C. § 7433.  Official statements and actions of Congress, of U.S. agencies and of its ambassadors, subsequent to the Act's enactment, expressly construe and support reading the Foreign Nationals Exception as it plainly appears — to authorize assistance to ICC prosecutions of foreign nationals.

## I.   UNITED STATES AMBASSADORS VIEW THE FOREIGN NATIONALS EXCEPTION AS "LICENS[ING] INTERACTION WITH THE ICC"

The United States Ambassador-at-Large for War Crimes Issues from 2006 to 2009, Ambassador Clint Williamson framed the Foreign Nationals Exception frankly:

> We have really relied on the final provision of [the Act], which is sort of this **get-out-of-jail-free card**, which says that nothing in this act shall constrain the U.S. from doing what's necessary to bring people to justice for genocide and other serious crimes. We have used this final provision **to license our interaction with the ICC**. But it's really can [sic] be applied on a case by case basis, and this has allowed us, I think, great latitude on Darfur.[1]

This interpretation is precisely that which Applicants argue — the provision independently excepts assistance to ICC prosecutions of foreign nationals.  Reading in some sort of executive department exception to permit State Department officials to assist the ICC is expressly forbidden by the Act. 22 U.S.C. § 7431.

In 2009, Ambassador Williamson highlighted three State Department actions supporting the ICC that could only be authorized by the Foreign Nationals Exception.  *See* Clint Williamson, *Luncheon Keynote, August 25, 2008*, 40 STUD. TRANSNAT'L LEGAL POL'Y 79, 83 (2009).  *First*, in 2005, the United States abstained from voting on the UN Security Council's resolution referring

---

[1] Beth Van Schaak, *State Cooperation & the International Criminal Court: A Roll for the United States?*, SANTA CLARA L. DIG. COMMONS 1, 8 (2011), http://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=1615&context=facpubs (quoting Clint Williamson, Ambassador-at-Large for War Crimes Issues, U.S. Dep't State, Remarks at the Century Foundation on Reassessing the International Criminal Court: Ten Years Past Rome (Jan. 13, 2009)).

1   the situation in Darfur to the prosecutor of the ICC, rather than exercising its right to veto.  *Id.*; *see*

2   *also* RJN Ex. 1.  *Second*, Williamson pointed to United States support to the trial of former

3   Liberian President Charles Taylor at the ICC.  Williamson, *Luncheon*, *supra*, at 83.  The UN

4   Security Council, citing regional stability concerns in Western Africa, unanimously approved

5   Taylor's transfer from the Special Court for Sierra Leone to the ICC for his trial.  RJN Ex. 2.

6   *Third*, Ambassador Williamson noted "the expressed willingness to share information with the

7   court in the same way we do with the other tribunals."  Williamson, *Luncheon*, *supra*, at 83.  All

8   three, without the independent savings clause reading of the Foreign Nationals Exception, give rise

9   to potential violations of the Act irremediable by the non-delegable Presidential waiver authority.

10  *See* 22 U.S.C. §§ 7422, 7423(e), 7431.

11      In 2011, despite changed administrations, the U.S. Permanent Representative to the UN,

12  Ambassador Susan Rice, adopted the same position on the Foreign Nationals Exception.

13  Ambassador Rice directly supported the ICC by voting in favor of the UN Security Council's

14  resolution referring the Libya situation to the ICC, again without a Presidential waiver.  Human

15  Rights Watch, *UN: Security Council Refers Libya to ICC* (New York Feb. 27, 2011),

16  https://www.hrw.org/news/2011/02/27/-un-security-council-refers-libya-icc.  The State

17  Department, moreover, *actively lobbied* for its passage.  *Id.*

18  **II.    THE STATE DEPARTMENT'S REWARDS FOR JUSTICE PROGRAM**

19      Like its ambassadors, the State Department has long rendered material assistance to

20  international tribunals prosecuting foreign nationals accused of serious international crimes.  A

21  straight-forward example is the State Department's Rewards for Justice Program, which was

22  established by the 1984 Act to Combat International Terrorism.  22 U.S.C. § 2708.  It expressly

23  provides that the authority to implement and administer the program is at the "sole discretion" of

24  the Secretary of State.  22 U.S.C. § 2708(b).  The program provides for the payment of rewards to

25  assist in the prevention of serious violations of international humanitarian law and other related

26  criminal acts.  22 U.S.C. § 2708(a).[2]

27  _____

28  [2] Following the Program's establishment in 1984, Congress has regularly updated the Program to
    counter emerging international criminal threats and adapt to developing global legal infrastructures

In 2013, Congress expanded the Rewards Program as it had on several prior occasions, this time authorizing the "Secretary of State to publicize and pay rewards for information leading to the arrest and conviction of specifically identified foreign nations accused of war crimes, crimes against humanity or genocide before *any* international criminal tribunal" including the ICC.  *See The State Department's Rewards Programs:  Performance and Potential:  Hearing before the Subcomm. On Terrorism, Nonproliferation, and Trade of the H. Comm. on Foreign Affairs*, 112th Cong. 129 (2012) (statement of Stephen Rapp, Ambassador-at-Large, Office of Global Criminal Justice).  In support of the amendment, Ambassador Stephen Rapp testified before Congress stating that the update was "consistent with [the Act] and being a case-by-case determination that is allowed by [the Act] where we can provide assistance to international justice."  *Id.*  This reading of the structure of the Act in connection with the Rewards Program was expressly called for by the enacting Senate.  *See* S. Rep. No. 112-232, at 3–4 (2012).  The Senate report on the bill notes that the update "could provide authority for rewards with respect to foreign nationals indicted by the International Criminal Court, but 'limits the rewards authority to cases of crimes committed by 'foreign nationals[.]'''" Explaining this limitation, the Report states that Section 5 of the legislation expressly provides "that nothing in [the statute] shall be construed as authorizing the use of activity precluded under [the Act.]"  [The Act] reads in part, "Nothing in this title shall prohibit the United States from rendering assistance to international efforts to bring to justice . . . foreign nationals accused of genocide, war crimes or crimes against humanity."  *Id.* at 4.  In other words, the expanded Program justifies its potential support of ICC prosecutions via the Foreign Nationals Exception alone.

The Rewards Program has led to the successful support of ICC prosecutions and has done so without Presidential waiver, including in response to ICC warrants.  *See* RJN Exs. 3–4.  There are at least two pending ICC prosecutions in which the government is currently seeking to provide assistance: that of Dominic Ongwen (a Ugandan military official accused of crimes against

---

and to provide the Secretary of State with authority to assist with various special international tribunals.

1  humanity) and of Jean Bosco Ntaganda (a Congolese rebel commander accused of war crimes).

2  *See* RJN Ex. 3; RJN Ex. 4.  The United States not only helped target these fugitives for ICC

3  prosecution, but was directly involved in Mr. Ntaganda's apprehension in 2013 "at the U.S.

4  embassy in Rwanda for extradition to the International Criminal Court."  RJN Ex. 4.  When the

5  ICC later took custody of Ntaganda, it issued a press release expressly thanking "American

6  authorities" for their "support and cooperation … in Kigali (Rwanda) and in the Netherlands."  *See*

7  Press Release, ICC, *Bosco Ntaganda in the ICC's Custody*, ICC-CPI-20130322-PR888 (Mar. 22,

8  2013), https://www.icc-cpi.int/Pages/item.aspx?name=pr888&ln=en.

9       In other words, in both practice and formal procedure, government agencies and Congress

10  recognize that support of ICC prosecutions of foreign nationals does not require Presidential waiver

11  or otherwise violate the Act.

12                         *       *       *

13       The consequences of Chevron's position deserve attention as well.  Chevron urges the

14  surprising conclusion that U.S. agencies, U.S. Ambassadors, and Congress all violated the Act for

15  as much as thirteen of the Act's fifteen years in existence.  Adopting this unprecedented position

16  would call into question nearly all past U.S.–ICC policy, discontinue valued accountability

17  mechanisms like the Rewards Program, restrain U.S. cooperation in ways that do not make sense,

18  and potentially subject U.S. officials to jeopardy in ways that Congress never intended.

19                         **CONCLUSION**

20       Applicants stress their view that Section 7433's objective clarity gives this Court, like the

21  State Department or other government branches or instrumentalities, ample grounds to provide

22  assistance to the ICC without resort to Presidential waiver.  The only requirement is that such

23  assistance be rendered solely as to foreign nationals, which is clearly the case in this dispute.

24       For the reasons stated herein, Applicants ask that the Court deny Chevron's motion.

25

26

27

28

SUPP. BRIEF ISO APPLICANTS' OPP. TO CHEVRON'S MOTION TO QUASH

Dated:  June 29, 2017

Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By:   _/s/Eva Schueller_
            Eva Schueller, Esq.

Attorneys for Applicants

SUPP. BRIEF ISO APPLICANTS' OPP. TO CHEVRON'S MOTION TO QUASH

1   J. Noah Hagey, Esq. (SBN: 262331)
        hagey@braunhagey.com
2   Eva Schueller, Esq. (SBN: 237886)
        schueller@braunhagey.com
3   BRAUNHAGEY & BORDEN LLP
    220 Sansome Street, Second Floor
4   San Francisco, CA 94104
    Telephone: (415) 599-0210
5   Facsimile: (415) 276-1808

6   COUNSEL FOR APPLICANTS SAM RAINSY
    and ICC FILING VICTIMS
7

8                    **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10

11
    *In re* Ex Parte Application of                    Case No. 4:16-mc-80258-DMR
12
    SAM RAINSY and FILING VICTIMS before
13  the International Criminal Court,                   **FILING VICTIMS' REQUEST FOR
                                                        JUDICIAL NOTICE IN SUPPORT OF
14          Applicants,                                 FILING VICTIMS' SUPPLEMENTAL
                                                        BRIEF IN SUPPORT OF APPLICANTS'
15  For an Order Pursuant to 28 U.S.C. § 1782          OPPOSITION TO CHEVRON
    Granting Leave to Obtain Discovery from            CORPORATION'S MOTION TO QUASH
16                                                      AND MOTION TO VACATE ORDER
    CHEVRON CORPORATION,                               GRANTING THE INTERNATIONAL
17                                                      CRIMINAL COURT FILING VICTIMS'
    For use in Foreign Proceedings.                    AND SAM RAINSY'S APPLICATION
18                                                      FOR DISCOVERY UNDER 28 U.S.C.
                                                        § 1782**
19
                                                       [Submitted concurrently with Applicants'
20                                                     Supplemental Briefing]

21

22

23

24

25

26

27

28

Applicants hereby request that the Court take judicial notice pursuant to Federal Rule of Evidence 201 of the following:

**Exhibit 1:** Press Release, Security Council, Security Council Refers Situation in Darfur, Sudan, to Prosecutor of International Criminal Court, U.N. Press Release SC/8351 (Mar. 31, 2005), https://www.un.org/press/en/2005/sc8351.doc.htm.

**Exhibit 2:** Press Release, Security Council, Security Approves Trial Transfer of Former Liberian President Charles Taylor to Netherlands, U.N. Press Release SC/8755 (June 16, 2008), https://www.un.org/press/en/2005/sc8351.doc.htm.

**Exhibit 3:** Office of Global Criminal Justice, *Wanted: Dominic Ongwen*, U.S. DEPARTMENT OF STATE (Mar. 13, 2013), https://www.state.gov/j/gcj/wcrp/206079.htm.

**Exhibit 4:** Office of Global Criminal Justice, *Wanted: Jean Bosco Ntganda*, U.S. DEPARTMENT OF STATE (Mar. 6, 2013), https://www.state.gov/j/gcj/wcrp/206083.htm.

Dated:  June 29, 2017                            Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By:   */s/Eva Schueller*
             Eva Schueller, Esq.

Attorneys for Applicants

# EXHIBIT 1

Case 1:16-cv-01025-RDM Document 34-5 Filed 06/29/17 Page 13 of 31

# UNITED NATIONS | PRESS RELEASE

# SECURITY COUNCIL REFERS SITUATION IN DARFUR, SUDAN, TO PROSECUTOR OF INTERNATIONAL CRIMINAL COURT

5158th Meeting (Night)

**SECURITY COUNCIL REFERS SITUATION IN DARFUR, SUDAN, TO PROSECUTOR**

**OF INTERNATIONAL CRIMINAL COURT**

**Resolution 1593 (2005) Adopted by Vote of 11 in Favour**

**To None Against, with 4 Abstentions (Algeria, Brazil, China, United States)**

Acting under Chapter VII of the United Nations Charter, the Security Council decided this evening to refer the situation prevailing in Darfur since 1 July 2002 to the Prosecutor of the International Criminal Court.

Adopting resolution 1593 (2005) by a vote of 11 in favour, none against with 4 abstentions (Algeria, Brazil, China, United States), the Council decided also that the Government of the Sudan and all other parties to the conflict in Darfur would cooperate fully with the Court and Prosecutor, providing them with any necessary assistance.

The Council decided further that nationals, current or former officials or personnel from a contributing State outside the Sudan which was not a party to the Rome Statute would be subject to the exclusive jurisdiction of that contributing State for all alleged acts or omissions arising out of or related to operations in the Sudan authorized by the Council or the African Union, unless such exclusive jurisdiction had been expressly waived by that contributing State.

Inviting the Court and the African Union to discuss practical arrangements that would facilitate the Court's work, including the possibility of conducting proceedings in the region, the Council encouraged the Court, in accordance with the Rome Statute, to support international cooperation with domestic efforts to promote the rule of law, protect human rights and combat impunity in Darfur.  It also emphasized the need to promote healing and reconciliation, as well as the creation of institutions, involving all sectors of Sudanese society, such as truth and/or reconciliation commissions, in order to complement judicial processes and thereby reinforce the efforts to restore long-lasting peace.

Speaking in explanation of position after the vote were the representatives of the United States, Algeria, China, Denmark, Philippines, Japan, United Kingdom, Argentina, France, Greece, United Republic of Tanzania, Romania, Russian Federation, Benin and Brazil.

The representative of the Sudan also addressed the Council.

The meeting began at 10:40 p.m. and ended at 11:55 p.m.

Council Resolution

Security Council resolution 1593 (2005) reads, as follows:

"*The Security Council*,

"Taking note of the report of the International Commission of Inquiry on violations of international humanitarian law and human rights law in Darfur (S/2005/60),

"Recalling article 16 of the Rome Statute under which no investigation or prosecution may be commenced or proceeded with by the International Criminal Court for a period of 12 months after a Security Council request to that effect,

"Also recalling articles 75 and 79 of the Rome Statute and encouraging States to contribute to the ICC Trust Fund for Victims,

"Taking note of the existence of agreements referred to in Article 98-2 of the Rome Statute,

"Determining that the situation in Sudan continues to constitute a threat to international peace and security,

"Acting under Chapter VII of the Charter of the United Nations,

"1.   Decides to refer the situation in Darfur since 1 July 2002 to the Prosecutor of the International Criminal Court;

"2.   Decides that the Government of Sudan and all other parties to the conflict in Darfur shall cooperate fully with and provide any necessary assistance to the Court and the Prosecutor pursuant to this resolution and, while recognizing that States not party to the Rome Statute have no obligation under the Statute, urges all States and concerned regional and other international organizations to cooperate fully;

"3.   Invites the Court and the African Union to discuss practical arrangements that will facilitate the work of the Prosecutor and of the Court, including the possibility of conducting proceedings in the region, which would contribute to regional efforts in the fight against impunity;

"4.   Also encourages the Court, as appropriate and in accordance with the Rome Statute, to support international cooperation with domestic efforts to promote the rule of law, protect human rights and combat impunity in Darfur;

"5.   Also emphasizes the need to promote healing and reconciliation and encourages in this respect the creation of institutions, involving all sectors of Sudanese society, such as truth and/or reconciliation commissions, in order to complement judicial processes and thereby reinforce the efforts to restore long-lasting peace, with African Union and international support as necessary;

"6.   Decides that nationals, current or former officials or personnel from a contributing State outside Sudan which is not a party to the Rome Statute of the International Criminal Court shall be subject to the exclusive jurisdiction of that contributing State for all alleged acts or omissions arising out of or related to operations in Sudan established or authorized by the Council or the African Union, unless such exclusive jurisdiction has been expressly waived by that contributing State;

"7.   Recognizes that none of the expenses incurred in connection with the referral, including expenses related to investigations or prosecutions in connection with that referral, shall be borne by the United Nations and that such costs shall be borne by the parties to the Rome Statute and those States that wish to contribute voluntarily;

"8.   Invites the Prosecutor to address the Council within three months of the date of adoption of this resolution and every six months thereafter on actions taken pursuant to this resolution;

"9.   Decides to remain seized of the matter."

<u>Action on Text</u>

The draft resolution was adopted by a vote of 11 in favour with 4 abstentions (Algeria, Brazil, China, United States).

Following the vote, ANNE WOODS PATTERSON (United States) said her country strongly supported bringing to justice those responsible for the crimes and atrocities that had occurred in Darfur and ending the climate of impunity there.  Violators of international humanitarian law and human rights law must be held accountable.  Justice must be served in Darfur.  By adopting today's resolution, the international community had established an accountability mechanism for the perpetrators of crimes and atrocities in Darfur.  The resolution would refer the situation in Darfur to the International Criminal Court (ICC) for investigation and prosecution.

While the United States believed that a better mechanism would have been a hybrid tribunal in Africa, it was important that the international community spoke with one voice in order to help promote effective accountability.  The United States continued to fundamentally object to the view that the Court should be able to exercise jurisdiction over the nationals, including government officials, of States not party to the Rome Statute.  Because it did not agree to a Council referral of the situation in Darfur to the Court, her country had abstained on the vote.  She decided not to oppose the resolution because of the need for the international community to work together in order to end the climate of impunity in the Sudan, and because the resolution provided protection from investigation or prosecution for United States nationals and members of the armed forces of non-State parties.

The United States was and would be an important contributor to the peacekeeping and related humanitarian efforts in the Sudan, she said.  The language providing protection for the United States and other contributing States was precedent-setting, as it clearly acknowledged the concerns of States not party to the Rome Statute and recognized that persons from those States should not be vulnerable to investigation or prosecution by the Court, absent consent by those States or a referral by the Council.  In the future, she believed that, absent consent of the State involved, any investigations or prosecutions of nationals of non-party States should come only pursuant to a decision by the Council.

Although her delegation had abstained on the Council referral to the Court, it had not dropped, and indeed continued to maintain, its long-standing and firm objections and concerns regarding the Court, she continued.  The Rome Statute was flawed and did not have sufficient protection from the possibility of politicized prosecutions.  Non-parties had no obligations in connection with that treaty, unless otherwise decided by the Council, upon which members of the Organization had conferred primary responsibility for the maintenance of international peace and security.

She was pleased that the resolution recognized that none of the expenses incurred in connection with the referral would be borne by the United Nations, and that instead such costs would be borne by the parties to the Rome Statute and those that contributed voluntarily.  That principle was extremely important.  Any effort to retrench on that principle by the United Nations or other organizations to which the United States contributed could result in its withholding funding or taking other action in response.

The Council included, at her country's request, a provision that exempted persons of non-party States in the Sudan from the ICC prosecution.  Persons from countries not party who were supporting the United Nations' or African Union's efforts should not be placed in jeopardy.  The resolution provided clear protection for United States persons.  No United States person supporting operations in the Sudan would be subject to investigation or prosecution because of this resolution.  That did not mean that there would be immunity for American citizens that acted in violation of the law.  The United States would continue to discipline its own people when appropriate.

ABDALLAH BAALI (Algeria) said his country believed strongly in the crucial importance of combating impunity if peace and stability were to take root -- a need that was even more vital in the case of Darfur, where relations between various communities had been destroyed over the years.  It was, therefore, important that the fight against impunity had the equal goal of re-establishing harmony among the peoples of Darfur while serving the cause of peace.

He said that any international démarche towards those ends must be reinforced in a way that guaranteed a fair and transparent trial process; brought justice for the victims by restoring their rights and providing reparations for their moral and material suffering; contributed towards national reconciliation, a political settlement of the crisis and the consolidation of peace and stability throughout the Sudan; and promoted the support of all Sudanese in that process, including, in particular, securing the cooperation of the Government.

Because of those factors, the African Union was best placed to carry out so delicate an undertaking because it could provide peace, while also satisfying the need for justice, he said.  President Olusegun Obasanjo had made a proposal, on behalf of the African Union, based on the need to secure peace without sacrificing the need for justice.  Regrettably, for the sake of reconciliation, the Council had neither considered that proposal nor assessed its potential to enable its members to combat impunity.  One could not claim to support the African Union while brushing aside its proposals without deigning even to

consider them.  At the eruption of the Darfur conflict, it had been none other than the African Union that had deployed its soldiers and begun negotiating the various complex issues involved.  What was true of the Sudan was true all over Africa, and Algeria regretted that for the sake of compromise at any cost those who defended the principle of universal justice had, in fact, confirmed that even in the Council there could be a double standard.

WANG GUANGYA (China), explaining his delegation's abstention, said that China had followed the situation in Darfur closely and supported a political solution.  Like the rest of the international community, China deplored deeply the violations of international humanitarian law and human rights law and believed that the perpetrators must be brought to justice.  The question before the Council was what was the most appropriate way to do so.  While ensuring justice, it was important to sustain the hard-won gains of the North-South peace process.

He said his country would have preferred that the perpetrators stand trial in Sudanese courts, which had recently taken action against people involved in human rights violations in Darfur.  China did not favour the referral to the International Criminal Court without the consent of the Sudanese Government.  In addition, China, which was not a party to the Rome Statute, had major reservations regarding some of its provisions and had found it difficult to endorse the Council authorization of that referral.

ELLEN MARGRETHE LØJ (Denmark) said that it had been two months since the Council had received the report of the Commission of Inquiry, which had strongly recommended referring the situation in Darfur to the ICC.  The Court had the mandate, capacity and funding necessary to ensure swift and effective prosecution.  She was encouraged that the Council had voted to adopt a resolution to bring an internationally recognized follow-up to the crimes in Darfur.  She recognized the difficulty of some delegations to accept the text and appreciated the flexibility shown.

Denmark had only been able to support the text after some alterations were made, she said.  Regarding the formulation on existing agreements referred to in article 98-2 of the Rome Statute, she noted that that reference was purely factual and referred to the existence of such agreements.  Thus, the reference was in no way impinging on the Rome Statute.  The result was a valid compromise leading to the first referral of a situation to the ICC.  She looked forward to the Court taking the first steps to ending the culture of impunity in Darfur.

LAURO BAJA (Philippines) noted that today's was the third resolution borne out of the Council's consideration of Darfur.  He had voted for the resolution in response to the urgency and gravity of the crimes, which the Council and the international community were obliged to address.  Any failure of action two months after the presentation of the report would have reduced the Council to irrelevance in ending impunity and protecting human rights and international humanitarian law.

He shared the concerns of some regarding the manner in which the resolution was arrived at.  Once again, veto threats prevented the expression of a clear and robust signal from the Council.  That was why calls for Council reform were growing louder with each passing day.  He also believed that the ICC was a fatality in the resolution.  Did the Council have the prerogative to mandate the jurisdiction of the Court?

KENZO OSHIMA (Japan) said he had voted in favour of the resolution because impunity for serious violations of human rights and crimes against humanity must not be allowed.  Japan supported in principle the referral to the International Criminal Court within the appropriate time-frame, although it was not a party to the Rome Statute and would have much preferred more agreement among Council members.

EMYR JONES PARRY (United Kingdom) said that by tonight's vote the Council had acted to ensure accountability for the crimes committed in Darfur.  The United Kingdom hoped to send a salutary warning to other parties who may be tempted to commit similar human rights violations.  The United Kingdom welcomed the adoption of the two other resolutions on the Sudan this week and called for a redoubling of efforts on behalf of peace and justice for the people of Darfur, and the Sudan as a whole, who had suffered enough.  The three resolutions were a substantial contribution towards that end.

CÉSAR MAYORAL (Argentina) said he had voted in support of the resolution on the basis of the report to the Council by the High Commissioner for Human Rights, who stated clearly what had been crimes against humanity in Darfur.  The legal context for dealing with such violations was the ICC.  He understood that the ICC would be the proper place to combat impunity.  The resolution gave strong support to the Court and demonstrated significant progress within the United Nations to ensure the functioning of an international system for human rights, for which the Court was an essential tool.

He noted that it was the first time the Council had referred to the Court a situation involving crimes over which the Court had jurisdiction. It was a crucial precedent. The letter and spirit of the Rome Statute must be respected, taking into account the legitimate concerns of States. Accordingly, he regretted that the Council had to adopt a text that provided an exemption to the Court, and hoped that that would not become normal practice. The exemption referred to in operative paragraph 6 only applied to those States not party to the Rome Statute.

JEAN-MARC DE LA SABLIERE (France) said the events in Darfur were deeply troubling, and the greatest concern was the plight of the people there. The Secretary-General's reports had provided a detailed picture of those atrocities. The Council had a duty to take action. Its policy must include three elements. The first was the need to assist the African Union to strengthen its mandate for protection and monitoring. The Council had done that by adopting resolution 1590 last week. Then, there was the need to exert pressure on the warring parties to fulfil their obligations and achieve a political settlement. The Council did that by adopting resolution 1591 a few days ago. Finally, it was necessary to put an end to impunity. That was what the Council had done today.

The Commission's report recommended the referral of the situation in Darfur to the ICC, he said. The Secretary-General and the High Commissioner for Human Rights had asked the Council to urgently provide a positive outcome following that recommendation. Referring the issue to the ICC was the only solution. It was necessary to do right by the victims, and doing so would prevent those violations from continuing. That was why France had been the initiator of the resolution and voted in its favour. He was gratified by the adoption of this historic resolution, by which the Council, for the first time, referred a situation to the ICC.

Thus, the Council had sent a strong message to all those in Darfur who had committed or were tempted to commit atrocious crimes, and to the victims. The international community would not allow those crimes to remain unpunished. It also marked a turning point and sent a message farther than Darfur. His delegation had been ready to acknowledge immunity from the ICC for nationals from States not party to the Rome Statute. He reaffirmed his confidence in the ICC and hoped that those clauses concerning immunity from the Court would be dropped very soon.

ADAMANTIOS TH. VASSILAKIS (Greece) stressed that impunity must not be allowed to go unpunished and that was why his country had turned to the International Criminal Court. It would have preferred a text that did not make exceptions, but it was better than one that allowed violations to go unpunished. The text strengthened the Council's authority, as well as that of the International Criminal Court, which would have the possibility of showing its competence. The three recently adopted resolutions on Darfur would assist in restoring peace in the Sudan.

AUGUSTINE MAHIGA (United Republic of Tanzania) said that every new delay in the adoption of the resolution represented a failure to serve the interests of justice, and his delegation regretted that the text took on matters that did not concern the Council. It did not permit any avoidance of the International Criminal Court's authority, and the United Republic of Tanzania hoped that the international community would not abandon the people of the Sudan, particularly those of Darfur.

MIHNEA IOAN MOTOC (Romania) said that text spoke for itself in showing the way the Council could come together to address serious issues. The adoption of resolution 1593 was a stand against impunity and an expression of confidence in the ICC to handle complex cases, like the one the Council was referring to it today. At the end of the day, the Council had sent a message that there was no way that anyone anywhere could get away without retribution for grave crimes. By deciding to refer Darfur to the ICC, the Council had enhanced its conflict prevention and resolution capabilities. Upholding the ICC by adopting the resolution would be to no avail unless States remained supportive of the Court as it exercised its prerogatives.

ANDREY DENISOV (Russian Federation) said that Council members had reaffirmed that the struggle against impunity was one of the elements of long-term stability in Darfur. All those responsible for grave crimes must be punished, as pointed out in the report of the Commission of Inquiry. The resolution adopted today would promote an effective solution to the fight against impunity.

JOEL ADECHI (Benin) said the vote was a major event in the context of the international community's attempts to ensure there was no impunity for violations of international humanitarian law in the past decade. Benin had voted in favour of the resolution because it was party to the Rome Statute and also because the worsening of the situation in Darfur meant that the Council must take action to end the suffering of the civilians, ending impunity by providing impartial justice. Benin had also voted in favour out of respect for human dignity and the right to life. The African Union recognized that the

international community had a responsibility to protect civilians when they were not protected by their own governments. The resolution must help them to achieve their legitimate dream of an end to their suffering and enable them to look ahead to the future with serenity.

Council President RONALDO MOTA SARDENBERG (<u>Brazil</u>), speaking in his national capacity, said his country was in favour of the resolution, but had been unable to join those who had voted in favour.  However, Brazil was ready to cooperate fully with the International Criminal Court whenever necessary.  The Court provided all the necessary checks and balances to prevent politically motivated prosecutions, and any fears to the contrary were both unwarranted and unhelpful.

However, there were limits to the responsibilities of the Council vis-à-vis international instruments, and Brazil had consistently maintained that position since the negotiations on the Rome Statute.  But the Court remained the only suitable institution to deal with the violations in the Sudan.  Brazil had been unable to support operative paragraph 6, which recognized exclusive jurisdiction.  It would not strengthen the role of the International Criminal Court.

ELFATIH MOHAMED AHMED ERWA (<u>Sudan</u>) said that, once more, the Council had persisted in adopting unwise decisions against his country, which only served to further complicate the situation on the ground.  The positions over the ICC were well known.  The Darfur question had been exploited in light of those positions.  It was a paradox that the language in which the resolution was negotiated was the same language that had buffeted the Council before on another African question. The resolution adopted was full of exemptions.  He reminded the Council that the Sudan was also not party to the ICC, making implementation of the resolution fraught with procedural impediments.  As long as the Council believed that the scales of justice were based on exceptions and exploitation of crises in developing countries and bargaining among major Powers, it did not settle the question of accountability in Darfur, but exposed the fact that the ICC was intended for developing and weak countries and was a tool to exercise cultural superiority.

The Council, by adopting the resolution, had once again ridden roughshod over the African position, he said.  The initiative by Nigeria, as chair of the African Union, had not even been the subject of consideration.  Also, the Council had adopted the resolution at a time when the Sudanese judiciary had gone a long way in holding trials, and was capable of ensuring accountability.  Some here wanted to activate the ICC and exploit the situation in Darfur.  Accountability was a long process that could not be achieved overnight.  The Council was continuing to use a policy of double standards, and sending the message that exemptions were only for major Powers.  The resolution would only serve to weaken prospects for settlement and further complicate the already complex situation.

 **For information media. Not an official record.**

# EXHIBIT 2

# SECURITY COUNCIL REFERS SITUATION IN DARFUR, SUDAN, TO PROSECUTOR OF INTERNATIONAL CRIMINAL COURT

5158th Meeting (Night)

### SECURITY COUNCIL REFERS SITUATION IN DARFUR, SUDAN, TO PROSECUTOR

### OF INTERNATIONAL CRIMINAL COURT

### Resolution 1593 (2005) Adopted by Vote of 11 in Favour

### To None Against, with 4 Abstentions (Algeria, Brazil, China, United States)

Acting under Chapter VII of the United Nations Charter, the Security Council decided this evening to refer the situation prevailing in Darfur since 1 July 2002 to the Prosecutor of the International Criminal Court.

Adopting resolution 1593 (2005) by a vote of 11 in favour, none against with 4 abstentions (Algeria, Brazil, China, United States), the Council decided also that the Government of the Sudan and all other parties to the conflict in Darfur would cooperate fully with the Court and Prosecutor, providing them with any necessary assistance.

The Council decided further that nationals, current or former officials or personnel from a contributing State outside the Sudan which was not a party to the Rome Statute would be subject to the exclusive jurisdiction of that contributing State for all alleged acts or omissions arising out of or related to operations in the Sudan authorized by the Council or the African Union, unless such exclusive jurisdiction had been expressly waived by that contributing State.

Inviting the Court and the African Union to discuss practical arrangements that would facilitate the Court's work, including the possibility of conducting proceedings in the region, the Council encouraged the Court, in accordance with the Rome Statute, to support international cooperation with domestic efforts to promote the rule of law, protect human rights and combat impunity in Darfur.  It also emphasized the need to promote healing and reconciliation, as well as the creation of institutions, involving all sectors of Sudanese society, such as truth and/or reconciliation commissions, in order to complement judicial processes and thereby reinforce the efforts to restore long-lasting peace.

Speaking in explanation of position after the vote were the representatives of the United States, Algeria, China, Denmark, Philippines, Japan, United Kingdom, Argentina, France, Greece, United Republic of Tanzania, Romania, Russian Federation, Benin and Brazil.

The representative of the Sudan also addressed the Council.

The meeting began at 10:40 p.m. and ended at 11:55 p.m.

Council Resolution

Security Council resolution 1593 (2005) reads, as follows:

"*The Security Council*,

"*Taking note* of the report of the International Commission of Inquiry on violations of international humanitarian law and human rights law in Darfur (S/2005/60),

"*Recalling* article 16 of the Rome Statute under which no investigation or prosecution may be commenced or proceeded with by the International Criminal Court for a period of 12 months after a Security Council request to that effect,

"*Also recalling* articles 75 and 79 of the Rome Statute and encouraging States to contribute to the ICC Trust Fund for Victims,

"*Taking note* of the existence of agreements referred to in Article 98-2 of the Rome Statute,

"*Determining* that the situation in Sudan continues to constitute a threat to international peace and security,

"*Acting* under Chapter VII of the Charter of the United Nations,

"1.   *Decides* to refer the situation in Darfur since 1 July 2002 to the Prosecutor of the International Criminal Court;

"2.   *Decides* that the Government of Sudan and all other parties to the conflict in Darfur shall cooperate fully with and provide any necessary assistance to the Court and the Prosecutor pursuant to this resolution and, while recognizing that States not party to the Rome Statute have no obligation under the Statute, urges all States and concerned regional and other international organizations to cooperate fully;

"3.   *Invites* the Court and the African Union to discuss practical arrangements that will facilitate the work of the Prosecutor and of the Court, including the possibility of conducting proceedings in the region, which would contribute to regional efforts in the fight against impunity;

"4.   *Also encourages* the Court, as appropriate and in accordance with the Rome Statute, to support international cooperation with domestic efforts to promote the rule of law, protect human rights and combat impunity in Darfur;

"5.   *Also emphasizes* the need to promote healing and reconciliation and encourages in this respect the creation of institutions, involving all sectors of Sudanese society, such as truth and/or reconciliation commissions, in order to complement judicial processes and thereby reinforce the efforts to restore long-lasting peace, with African Union and international support as necessary;

"6.   *Decides* that nationals, current or former officials or personnel from a contributing State outside Sudan which is not a party to the Rome Statute of the International Criminal Court shall be subject to the exclusive jurisdiction of that contributing State for all alleged acts or omissions arising out of or related to operations in Sudan established or authorized by the Council or the African Union, unless such exclusive jurisdiction has been expressly waived by that contributing State;

"7.   *Recognizes* that none of the expenses incurred in connection with the referral, including expenses related to investigations or prosecutions in connection with that referral, shall be borne by the United Nations and that such costs shall be borne by the parties to the Rome Statute and those States that wish to contribute voluntarily;

"8.   *Invites* the Prosecutor to address the Council within three months of the date of adoption of this resolution and every six months thereafter on actions taken pursuant to this resolution;

"9.   *Decides* to remain seized of the matter."

<u>Action on Text</u>

The draft resolution was adopted by a vote of 11 in favour with 4 abstentions (Algeria, Brazil, China, United States).

Following the vote, ANNE WOODS PATTERSON (United States) said her country strongly supported bringing to justice those responsible for the crimes and atrocities that had occurred in Darfur and ending the climate of impunity there.  Violators of international humanitarian law and human rights law must be held accountable.  Justice must be served in Darfur.  By adopting today's resolution, the international community had established an accountability mechanism for the perpetrators of crimes and atrocities in Darfur.  The resolution would refer the situation in Darfur to the International Criminal Court (ICC) for investigation and prosecution.

While the United States believed that a better mechanism would have been a hybrid tribunal in Africa, it was important that the international community spoke with one voice in order to help promote effective accountability.  The United States continued to fundamentally object to the view that the Court should be able to exercise jurisdiction over the nationals, including government officials, of States not party to the Rome Statute.  Because it did not agree to a Council referral of the situation in Darfur to the Court, her country had abstained on the vote.  She decided not to oppose the resolution because of the need for the international community to work together in order to end the climate of impunity in the Sudan, and because the resolution provided protection from investigation or prosecution for United States nationals and members of the armed forces of non-State parties.

The United States was and would be an important contributor to the peacekeeping and related humanitarian efforts in the Sudan, she said.  The language providing protection for the United States and other contributing States was precedent-setting, as it clearly acknowledged the concerns of States not party to the Rome Statute and recognized that persons from those States should not be vulnerable to investigation or prosecution by the Court, absent consent by those States or a referral by the Council.  In the future, she believed that, absent consent of the State involved, any investigations or prosecutions of nationals of non-party States should come only pursuant to a decision by the Council.

Although her delegation had abstained on the Council referral to the Court, it had not dropped, and indeed continued to maintain, its long-standing and firm objections and concerns regarding the Court, she continued.  The Rome Statute was flawed and did not have sufficient protection from the possibility of politicized prosecutions.  Non-parties had no obligations in connection with that treaty, unless otherwise decided by the Council, upon which members of the Organization had conferred primary responsibility for the maintenance of international peace and security.

She was pleased that the resolution recognized that none of the expenses incurred in connection with the referral would be borne by the United Nations, and that instead such costs would be borne by the parties to the Rome Statute and those that contributed voluntarily.  That principle was extremely important.  Any effort to retrench on that principle by the United Nations or other organizations to which the United States contributed could result in its withholding funding or taking other action in response.

The Council included, at her country's request, a provision that exempted persons of non-party States in the Sudan from the ICC prosecution.  Persons from countries not party who were supporting the United Nations' or African Union's efforts should not be placed in jeopardy.  The resolution provided clear protection for United States persons.  No United States person supporting operations in the Sudan would be subject to investigation or prosecution because of this resolution.  That did not mean that there would be immunity for American citizens that acted in violation of the law.  The United States would continue to discipline its own people when appropriate.

ABDALLAH BAALI (Algeria) said his country believed strongly in the crucial importance of combating impunity if peace and stability were to take root -- a need that was even more vital in the case of Darfur, where relations between various communities had been destroyed over the years.  It was, therefore, important that the fight against impunity had the equal goal of re-establishing harmony among the peoples of Darfur while serving the cause of peace.

He said that any international démarche towards those ends must be reinforced in a way that guaranteed a fair and transparent trial process; brought justice for the victims by restoring their rights and providing reparations for their moral and material suffering; contributed towards national reconciliation, a political settlement of the crisis and the consolidation of peace and stability throughout the Sudan; and promoted the support of all Sudanese in that process, including, in particular, securing the cooperation of the Government.

Because of those factors, the African Union was best placed to carry out so delicate an undertaking because it could provide peace, while also satisfying the need for justice, he said.  President Olusegun Obasanjo had made a proposal, on behalf of the African Union, based on the need to secure peace without sacrificing the need for justice.  Regrettably, for the sake of reconciliation, the Council had neither considered that proposal nor assessed its potential to enable its members to combat impunity.  One could not claim to support the African Union while brushing aside its proposals without deigning even to

consider them.  At the eruption of the Darfur conflict, it had been none other than the African Union that had deployed its soldiers and begun negotiating the various complex issues involved.  What was true of the Sudan was true all over Africa, and Algeria regretted that for the sake of compromise at any cost those who defended the principle of universal justice had, in fact, confirmed that even in the Council there could be a double standard.

WANG GUANGYA (China), explaining his delegation's abstention, said that China had followed the situation in Darfur closely and supported a political solution.  Like the rest of the international community, China deplored deeply the violations of international humanitarian law and human rights law and believed that the perpetrators must be brought to justice.  The question before the Council was what was the most appropriate way to do so.  While ensuring justice, it was important to sustain the hard-won gains of the North-South peace process.

He said his country would have preferred that the perpetrators stand trial in Sudanese courts, which had recently taken action against people involved in human rights violations in Darfur.  China did not favour the referral to the International Criminal Court without the consent of the Sudanese Government.  In addition, China, which was not a party to the Rome Statute, had major reservations regarding some of its provisions and had found it difficult to endorse the Council authorization of that referral.

ELLEN MARGRETHE LØJ (Denmark) said that it had been two months since the Council had received the report of the Commission of Inquiry, which had strongly recommended referring the situation in Darfur to the ICC.  The Court had the mandate, capacity and funding necessary to ensure swift and effective prosecution.  She was encouraged that the Council had voted to adopt a resolution to bring an internationally recognized follow-up to the crimes in Darfur.  She recognized the difficulty of some delegations to accept the text and appreciated the flexibility shown.

Denmark had only been able to support the text after some alterations were made, she said.  Regarding the formulation on existing agreements referred to in article 98-2 of the Rome Statute, she noted that that reference was purely factual and referred to the existence of such agreements.  Thus, the reference was in no way impinging on the Rome Statute.  The result was a valid compromise leading to the first referral of a situation to the ICC.  She looked forward to the Court taking the first steps to ending the culture of impunity in Darfur.

LAURO BAJA (Philippines) noted that today's was the third resolution borne out of the Council's consideration of Darfur.  He had voted for the resolution in response to the urgency and gravity of the crimes, which the Council and the international community were obliged to address.  Any failure of action two months after the presentation of the report would have reduced the Council to irrelevance in ending impunity and protecting human rights and international humanitarian law.

He shared the concerns of some regarding the manner in which the resolution was arrived at.  Once again, veto threats prevented the expression of a clear and robust signal from the Council.  That was why calls for Council reform were growing louder with each passing day.  He also believed that the ICC was a fatality in the resolution.  Did the Council have the prerogative to mandate the jurisdiction of the Court?

KENZO OSHIMA (Japan) said he had voted in favour of the resolution because impunity for serious violations of human rights and crimes against humanity must not be allowed.  Japan supported in principle the referral to the International Criminal Court within the appropriate time-frame, although it was not a party to the Rome Statute and would have much preferred more agreement among Council members.

EMYR JONES PARRY (United Kingdom) said that by tonight's vote the Council had acted to ensure accountability for the crimes committed in Darfur.  The United Kingdom hoped to send a salutary warning to other parties who may be tempted to commit similar human rights violations.  The United Kingdom welcomed the adoption of the two other resolutions on the Sudan this week and called for a redoubling of efforts on behalf of peace and justice for the people of Darfur, and the Sudan as a whole, who had suffered enough.  The three resolutions were a substantial contribution towards that end.

CÉSAR MAYORAL (Argentina) said he had voted in support of the resolution on the basis of the report to the Council by the High Commissioner for Human Rights, who stated clearly what had been crimes against humanity in Darfur.  The legal context for dealing with such violations was the ICC.  He understood that the ICC would be the proper place to combat impunity.  The resolution gave strong support to the Court and demonstrated significant progress within the United Nations to ensure the functioning of an international system for human rights, for which the Court was an essential tool.

He noted that it was the first time the Council had referred to the Court a situation involving crimes over which the Court had jurisdiction. It was a crucial precedent. The letter and spirit of the Rome Statute must be respected, taking into account the legitimate concerns of States. Accordingly, he regretted that the Council had to adopt a text that provided an exemption to the Court, and hoped that that would not become normal practice. The exemption referred to in operative paragraph 6 only applied to those States not party to the Rome Statute.

JEAN-MARC DE LA SABLIERE (France) said the events in Darfur were deeply troubling, and the greatest concern was the plight of the people there. The Secretary-General's reports had provided a detailed picture of those atrocities. The Council had a duty to take action. Its policy must include three elements. The first was the need to assist the African Union to strengthen its mandate for protection and monitoring. The Council had done that by adopting resolution 1590 last week. Then, there was the need to exert pressure on the warring parties to fulfil their obligations and achieve a political settlement. The Council did that by adopting resolution 1591 a few days ago. Finally, it was necessary to put an end to impunity. That was what the Council had done today.

The Commission's report recommended the referral of the situation in Darfur to the ICC, he said. The Secretary-General and the High Commissioner for Human Rights had asked the Council to urgently provide a positive outcome following that recommendation. Referring the issue to the ICC was the only solution. It was necessary to do right by the victims, and doing so would prevent those violations from continuing. That was why France had been the initiator of the resolution and voted in its favour. He was gratified by the adoption of this historic resolution, by which the Council, for the first time, referred a situation to the ICC.

Thus, the Council had sent a strong message to all those in Darfur who had committed or were tempted to commit atrocious crimes, and to the victims. The international community would not allow those crimes to remain unpunished. It also marked a turning point and sent a message farther than Darfur. His delegation had been ready to acknowledge immunity from the ICC for nationals from States not party to the Rome Statute. He reaffirmed his confidence in the ICC and hoped that those clauses concerning immunity from the Court would be dropped very soon.

ADAMANTIOS TH. VASSILAKIS (Greece) stressed that impunity must not be allowed to go unpunished and that was why his country had turned to the International Criminal Court. It would have preferred a text that did not make exceptions, but it was better than one that allowed violations to go unpunished. The text strengthened the Council's authority, as well as that of the International Criminal Court, which would have the possibility of showing its competence. The three recently adopted resolutions on Darfur would assist in restoring peace in the Sudan.

AUGUSTINE MAHIGA (United Republic of Tanzania) said that every new delay in the adoption of the resolution represented a failure to serve the interests of justice, and his delegation regretted that the text took on matters that did not concern the Council. It did not permit any avoidance of the International Criminal Court's authority, and the United Republic of Tanzania hoped that the international community would not abandon the people of the Sudan, particularly those of Darfur.

MIHNEA IOAN MOTOC (Romania) said that text spoke for itself in showing the way the Council could come together to address serious issues. The adoption of resolution 1593 was a stand against impunity and an expression of confidence in the ICC to handle complex cases, like the one the Council was referring to it today. At the end of the day, the Council had sent a message that there was no way that anyone anywhere could get away without retribution for grave crimes. By deciding to refer Darfur to the ICC, the Council had enhanced its conflict prevention and resolution capabilities. Upholding the ICC by adopting the resolution would be to no avail unless States remained supportive of the Court as it exercised its prerogatives.

ANDREY DENISOV (Russian Federation) said that Council members had reaffirmed that the struggle against impunity was one of the elements of long-term stability in Darfur. All those responsible for grave crimes must be punished, as pointed out in the report of the Commission of Inquiry. The resolution adopted today would promote an effective solution to the fight against impunity.

JOEL ADECHI (Benin) said the vote was a major event in the context of the international community's attempts to ensure there was no impunity for violations of international humanitarian law in the past decade. Benin had voted in favour of the resolution because it was party to the Rome Statute and also because the worsening of the situation in Darfur meant that the Council must take action to end the suffering of the civilians, ending impunity by providing impartial justice. Benin had also voted in favour out of respect for human dignity and the right to life. The African Union recognized that the

international community had a responsibility to protect civilians when they were not protected by their own governments. The resolution must help them to achieve their legitimate dream of an end to their suffering and enable them to look ahead to the future with serenity.

Council President RONALDO MOTA SARDENBERG (Brazil), speaking in his national capacity, said his country was in favour of the resolution, but had been unable to join those who had voted in favour.  However, Brazil was ready to cooperate fully with the International Criminal Court whenever necessary.  The Court provided all the necessary checks and balances to prevent politically motivated prosecutions, and any fears to the contrary were both unwarranted and unhelpful.

However, there were limits to the responsibilities of the Council vis-à-vis international instruments, and Brazil had consistently maintained that position since the negotiations on the Rome Statute.  But the Court remained the only suitable institution to deal with the violations in the Sudan.  Brazil had been unable to support operative paragraph 6, which recognized exclusive jurisdiction.  It would not strengthen the role of the International Criminal Court.

ELFATIH MOHAMED AHMED ERWA (Sudan) said that, once more, the Council had persisted in adopting unwise decisions against his country, which only served to further complicate the situation on the ground.  The positions over the ICC were well known.  The Darfur question had been exploited in light of those positions.  It was a paradox that the language in which the resolution was negotiated was the same language that had buffeted the Council before on another African question. The resolution adopted was full of exemptions.  He reminded the Council that the Sudan was also not party to the ICC, making implementation of the resolution fraught with procedural impediments.  As long as the Council believed that the scales of justice were based on exceptions and exploitation of crises in developing countries and bargaining among major Powers, it did not settle the question of accountability in Darfur, but exposed the fact that the ICC was intended for developing and weak countries and was a tool to exercise cultural superiority.

The Council, by adopting the resolution, had once again ridden roughshod over the African position, he said.  The initiative by Nigeria, as chair of the African Union, had not even been the subject of consideration.  Also, the Council had adopted the resolution at a time when the Sudanese judiciary had gone a long way in holding trials, and was capable of ensuring accountability.  Some here wanted to activate the ICC and exploit the situation in Darfur.  Accountability was a long process that could not be achieved overnight.  The Council was continuing to use a policy of double standards, and sending the message that exemptions were only for major Powers.  The resolution would only serve to weaken prospects for settlement and further complicate the already complex situation.

 **For information media. Not an official record.**

# EXHIBIT 3

# U.S. Department of State
## Diplomacy in Action

## Wanted: Dominic Ongwen
OFFICE OF GLOBAL CRIMINAL JUSTICE

---

**IN CUSTODY**

Information leading to the arrest, transfer, or conviction of

Dominic Ongwen

# Up to $5 Million Reward

---

 

**IN CUSTODY**

Dominic Ongwen is the subject of an arrest warrant by the International Criminal Court (ICC) for war crimes and crimes against humanity.

Ongwen is a Major General and Senior Commander of the Lord's Resistance Army (LRA), which has committed numerous atrocities against civilians across Uganda, the Democratic Republic of Congo (DRC), Central African Republic (CAR), and South Sudan. Ongwen is charged with responsibility for crimes against humanity and war crimes, for, among other acts, murder, enslavement, cruel treatment of civilians, and intentionally directing an attack against a civilian population. The African Union and United Nations Security Council have repeatedly condemned atrocities committed by the LRA.

To bring Ongwen to justice, the United States Government is offering a reward to individuals who furnish information leading to his arrest, transfer, or conviction for war crimes or crimes against humanity.

All information regarding the identity of any informant will be kept strictly confidential.

Link to Interpol RED NOTICE (http://www.interpol.int/Wanted-Persons/(wanted_id)/2006-26321).

**SUBMIT A TIP (http://www.rewardsforjustice.net/english/submit-a-tip.html)** (This link will take you to the Rewards for Justice website)

---

The Office of Website Management, Bureau of Public Affairs, manages this site as a portal for information from the U.S. State Department.

External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.

Note: documents in Portable Document Format (PDF) require Adobe Acrobat Reader 5.0 or higher to view, <u>download Adobe Acrobat Reader (http://get.adobe.com/reader/)</u>.

# EXHIBIT 4

# U.S. Department of State
## Diplomacy in Action

## Wanted: Jean Bosco Ntaganda
OFFICE OF GLOBAL CRIMINAL JUSTICE

---

**IN CUSTODY**

# Information leading to the arrest, transfer, or conviction of
# Jean Bosco Ntaganda
# Up to $5 Million Reward

---

 

Jean Bosco Ntaganda, now in custody, is the subject of arrest warrants by the International Criminal Court (ICC) for war crimes and crimes against humanity. In March Ntaganda turned himself in at the US embassy in Rwanda for extradition to the International Criminal Court, and will be transferred to The Hague, according to the court's chief prosecutor.

Ntaganda was a leader of the M23 rebel group in the Democratic Republic of the Congo (DRC), former leader of the National Congress for the Defense of the People (CNDP) and of the Union of Congolese Patriots/Patriotic Forces for the Liberation of the Congo (UPC/FPLC). Ntaganda is charged with responsibility for war crimes and crimes against humanity for, among other acts, enlisting and conscripting children under the age of fifteen and using them to participate actively in hostilities; murder; and rape and sexual slavery.

To bring Ntaganda to justice, the United States Government is offering a reward to individuals who furnish information leading to his arrest, transfer, or conviction for war crimes or crimes against humanity.

All information regarding the identity of any informant will be kept strictly confidential.

Link to Interpol RED NOTICE (http://www.interpol.int/Wanted-Persons/(wanted_id)/2008-26559).

---

The Office of Website Management, Bureau of Public Affairs, manages this site as a portal for information from the U.S. State Department.

External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.

Note: documents in Portable Document Format (PDF) require Adobe Acrobat Reader 5.0 or higher to view, <u>download Adobe Acrobat Reader (http://get.adobe.com/reader/)</u>.