J. Noah Hagey, Esq. (SBN: 262331)
    hagey@braunhagey.com
BRAUNHAGEY & BORDEN LLP
220 Sansome Street, Second Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

COUNSEL FOR APPLICANTS SAM RAINSY
and ICC FILING VICTIMS

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re* Ex Parte Application of<br><br>SAM RAINSY and FILING VICTIMS before the International Criminal Court,<br><br>    Applicants,<br><br>For an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery from<br><br>CHEVRON CORPORATION,<br><br>For use in Foreign Proceedings. | Case No. 4:16-mc-80258-DMR<br><br>**DECLARATION OF SAM RAINSY REGARDING STATUS OF CAMBODIA PROCEEDINGS** |

I, Rainsy Sam, declare as follows:

1. I make this declaration based on personal knowledge. If called as a witness, I could, and would, testify competently to the facts stated herein. Although I am a non-native English speaker, I can write and understand English to a relatively high degree. I am currently living in France because I cannot return to Cambodia. I have been physically threatened by government officials if I do, as have many of my supporters.

2. In prior declarations and submissions to this Court, I have sought to explain the need and value of the documents and information requested from Chevron Corporation ("Chevron") in our underlying Petition – and in connection with my legal case pending in Cambodia.

3. I understand that question has arisen again as to whether the requested materials can and will be used in my Cambodian case, to which the answer is "yes." Although I had understood this issue was settled and resolved by the parties in their August 3 filing, I am submitting this declaration to further explain the situation in Cambodia and our anticipated use of the critical materials sought from Chevron.

4. As brief context, after numerous rounds of litigation and negotiation, the Filing Victims, Chevron and I came to settlement. In early August 2017, I authorized my counsel at BraunHagey & Borden LLP to execute a stipulation to provide for the broad production of essential information regarding the murder of Dr. Kem Ley that will aid my investigation of my defenses and our prosecution of the ICC case.

5. We filed the stipulation on August 3, 2017. In reaching that agreement, I compromised on the scope and subject of various categories of information that we wanted from Chevron. I also agreed to withdraw my request for a deposition of Chevron witnesses who have firsthand knowledge of the events related to Dr. Kem Ley's death. I also understand that regional and higher level Chevron managers were briefed and involved in reporting about that incident – and possess information that we would have sought through deposition.

6. The Filing Victims and I entered the settlement in good faith and expected Chevron to quickly produce the material it had promised. The only remaining item under the settlement was for the parties to enter a standard "model" protective order. My understanding is that such

protective order would allow Chevron to protect "confidential" information that was truly sensitive and worthy of judicial protection – such as the names of specific local Cambodian witnesses.  We did not understand that a standard protective order would allow Chevron to somehow say how we could or could not use the materials they had agreed to give us beyond the fact that we would not be able to disclose highly sensitive information in public.  We have always have insisted that information Chevron agreed to provide would be and could be freely used in the investigation of our claims and defenses, without further restriction absent a showing that it was truly "confidential".

7.  It has always been important to us that the Court is going to continue to enforce the promises made to us by Chevron.  This is because of the gravity of the underlying events and Chevron's antagonism to providing information that would help solve Dr. Ley's murder.  Already we can see why that demand was so important – as Chevron has sought to use recent events to backtrack on its promise to give us the documents and information they agreed to provide in our settlement.

8.  The Court entered our stipulation and ordered Chevron's compliance on August 4, 2017.  Just a few days later, and potentially in an attempt to undermine it, the Cambodian appellate court issued a spontaneous summary decision rejecting my appeal without any argument.  This was done hastily and in contravention of Cambodian law.

9.  It never occurred to me that this event would impact Chevron's obligations to produce the material it promised to give us.  Chevron never reserved the right to challenge our stipulation or its obligations to produce documents, and the agreement contains no such exception.  Nor would we ever have contemplated such request – as it would give Chevron a free pass to continually raise the arguments that were being avoided by entering the stipulation.

10.  Regardless, my need for the documents to help support my legal case remain as strong today as when I filed the Petition.  On September 8, 2017, we filed my appeal of the appellate court's decision.  A true and correct translated copy of that submission to the Cambodian courts is appended as **Exhibit 1**.  My original filing in Cambodian Unicode script is appended as **Exhibit 2**.

11. That process is now pending. The appellate court's decision did not exhaust my legal remedies nor prevent me from seeking reconsideration of that decision based on new evidence (including evidence Chevron was obligated to produce). The decision also had no effect whatsoever on the pending ICC proceedings, which likewise remain live and ongoing.

12. Chevron was due to produce documents shortly after we entered a model protective order which I understand is commonly used in U.S. federal courts. As noted, our agreement provided that Chevron could protect documents on the basis of "confidentiality".

13. We sought to negotiate with Chevron on the form of a reasonable order. In response, Chevron demanded a very broad restriction on all of the material they were to produce, whether or not that information was confidential. For example, they sought to prevent our sharing the information with related parties or members of the media following my legal case or the ICC proceedings.

14. Chevron's demands for blanket restriction on all documents did not make sense to me. They did not appear directed to any legitimate goal and instead intended to hinder my ability to evaluate and use the material they promised to produce.

15. Although Chevron has refused to provide a log of its materials, we understand the company has detailed reports and other information regarding the killing in question. They have agreed to search various cell phones, computers and other places where information about Dr. Kem Ley's murder might exist. Such documentation and evidence will likely undercut the Cambodian government's narrative of the incident and its basis for prosecuting me – in addition to support other victims' related complaint submitted before the International Criminal Court.

16. We will necessarily need to share and evaluate this evidence with the numerous international stakeholders, investigators and consultants involved in both of the ICC and Cambodian legal matters. As such, I never expected or would have agreed to restrict my ability to use or share non-confidential materials. Such restrictions would effectively impose a "gag" on our ability to effectively communicate with investigators and partners about the case. It would undoubtedly hurt our ability to litigate our legal cases and bring the truth of Dr. Kem Ley's murder to light.

17. By way of example, Amnesty International has published a detailed report analyzing the video and photographic evidence related to Dr. Kem Ley's assassination. *See* https://www.amnesty.org/en/documents/asa23/5945/2017/en/ (last visited September 20, 2017). Amnesty may have additional evidence and information and it will be useful to gain their assistance in evaluating the new information that Chevron produces.

18. Such cooperation is critical in investigating international human rights abuse cases where victims have no real access to information, facts and evidence. This situation is unusual because contemporaneous reports are in an international corporation's possession and control.

19. To construct a legal case we will need to gather, review and share this evidence amongst multiple sources and organizations in order to form a broader understanding of the event. Building that case will be dramatically hampered or made nearly impossible without freedom of communication, particularly as to non-confidential documents. Imposing the restrictions sought by Chevron would substantially hinder my and the filing victims' ability to investigate and collaborate on our respective legal cases with third party human rights organizations.

20. Despite prolonged negotiations, Chevron insisted upon demanding restrictions on communication regarding non-confidential information that we had never agreed to, and never would have agreed to had Chevron brought it up during our settlement talks. (Just before we filed the stipulation, the parties exchanged early drafts of a protective order but had not entered negotiations and our counsel had not analyzed Chevron's position against the standard protective order.)

21. During our negotiations on the protective order, Chevron began to threaten to institute further legal proceedings attacking its own agreement and seeking to dismantle the parties' stipulation and the Court's August 4 Order. In doing so, their counsel also cast aspersions on our interest in obtaining information from Chevron in the first instance, suggesting that our Petition was some kind of ruse. I find these insinuations distasteful and telling.

22. In its September 1 filing, including Chevron's declaration which was never disclosed to us, Chevron made good on its threat to assail its own settlement. In addition to asking for a protective order far beyond the model in this Court, Chevron contends that the parties'

agreement and the Court's August 4 order is "moot" because my intermediate appeal was denied and makes inaccurate references to incomplete press accounts regarding the significance of the Chevron documents.

23. This is false as evidenced in my further appeal filings. While Chevron seeks to cast doubt on these appeals, I and many others in the Cambodian political system take them very seriously. Our goal is to promptly file information that Chevron provides to us with the Cambodian courts, as well as to share that information (to the extent we are allowed) with other organizations so that they might also aid in helping our legal case. The same information obviously will be used to help further investigate and likely amend the ICC complaint.

24. Under Cambodian law, introduction of new evidence to address a fundamental injustice and mistake at the trial or appellate court is permitted and we expect that Chevron's document production will be submitted to that Court once we have had opportunity to review its contents and discuss with my stakeholders. For example, Cambodia Article 445 which provides for reopening a case or granting Supreme Court review "Where new facts, documents, or other new evidence lead to reasonable doubt as to the guilt of a convicted person."

25. Chevron also misreports the grounds for my defense at the trial court as somehow being limited to the nature of the speech at issue – whereas truth certainly was a defense and I certainly did intend to (and will) raise it.

26. So that there is no mistake or question, the documents and information held by Chevron and which it is ordered to produce continue to be critical to our understanding of Dr. Kem Ley's assassination, my legal defense to the Cambodian government's claims and judgment against me. Such information will ensure that the underlying facts of this horrific episode are not forever hidden or lost.

27. I understand that absent this Court's enforcement of the stipulation and order, Chevron might have no ongoing obligation to preserve the evidence ordered produced in the

1 August 4 Order, meaning those facts related to Dr. Kem Ley's assignation might never come to
2 light.
3     I declare under penalty of perjury under the laws of the United States that the foregoing is
4 true and correct to the best of my personal knowledge.

Dated:  September 21, 2017                                   _____
                                                             Sam Rainsy